748 So.2d 1139 (1999)
STATE of Louisiana
v.
Jerry SMITH, Gerrick J. Watts, and Bernard Myles.
No. 98-K-2078.
Supreme Court of Louisiana.
October 29, 1999.
*1140 Richard P. Ieyoub, Attorney General, Anthony G. Falterman, District Attorney, Donald D. Candell, Gonazales, Counsel for Applicant.
Gwendolyn K. Brown, Robert E. Randolph, Baton Rouge, Winthrop G. Gardner, New Orleans, Frederick Kroenke, Jr., Baton Rouge, Counsel for Respondent.
PER CURIAM.[*]
Friends for life, the three defendants in this case stood trial together for second degree murder represented by the same lawyers, although it was undisputed that Watts alone fired the fatal shots which claimed the victim's life. Following their convictions for second degree murder and sentences of life imprisonment at hard labor, the defendants filed separate briefs on appeal through separate counsel, each claiming that the trial court knew or should have known that trial counsel had labored under an actual conflict of interest which eroded their zeal in representing their client. The court of appeal agreed that "[c]ounsel's ardor in defending Smith and Myles by placing all blame on Watts was dampened by their duty to defend Watts," while conversely, "their defense of Watts was impaired by their duty to defend Smith and Myles." State v. Smith, 96-2626, p. 6 (La.App. 1st Cir. 6/29/98), 715 So.2d 1226, 1230. The majority on the panel accordingly reversed the convictions and sentences of all three defendants. Id. Dissenting, Lottinger, C.J., argued that "[t]he defenses offered on behalf of all three defendants were compatible and entirely consistent." Smith, 96-2626 at 1, 715 So.2d at 1230 (Lottinger, C.J., dissenting). We granted the state's application because it appeared that the dissent had the better view of counsel's strategy under the particular circumstances of the trial and that the appellate record therefore did not allow a definitive answer to the defendants' claim that, in fact, trial counsel labored under conflicted and divided loyalties. See State v. Kahey, 436 So.2d 475, 484 (La.1983) ("An actual conflict of interest is established when the defendant proves that his attorney was placed in a situation inherently conducive to divided loyalties.") (citing Zuck v. Alabama, 588 F.2d 436, 439 (5th Cir.1979)). We now reverse.
This case began as a first degree murder prosecution of the defendants for the killing of Nazier "Mickey" Simmons on the night of January 5, 1994, after a sequence of events set in motion earlier that day by a telephone conversation in which the victim's wife, Jean Simmons, asked her brother, defendant Watts, to spin records that evening at a bar owned by the Simmonses in Darrow, Louisiana. The defendants had occasionally worked for Mickey Simmons at the bar, and Jean Simmons told her brother, in keeping with past custom, that she would leave the side door to her house open so he could go inside to change his clothes that evening before going to work at the bar. Watts recruited the help of his childhood friends, defendants Myles and Smith. Myles picked up his two friends and drove directly to the bar, without stopping at the Simmons home for Watts to change. When they got to the bar, Jean Simmons told them that she did not need them to work because they had arrived too late. The three defendants left the bar shortly thereafter, and decided to go to the Simmons residence on the way home. All three defendants testified that along the way they reached a common understanding they would take the money they claimed Mickey Simmons owed them for working at his bar. Myles therefore parked some distance away from the Simmons home to conceal their presence from the neighbors.
*1141 Using the unlocked side door, Watts entered the Simmons home and unlocked a second side door to let in Smith and Myles. Acting as a lookout, Myles paced back and forth through the open door while Smith and Watts searched the bedrooms looking for the cash they believed Mickey Simmons kept on the premises. The sudden and unexpected arrival of Mickey Simmons and his wife at the front of the home sent Smith and Myles darting out of the house and running through the backyard, leaving Watts inside the house to confront Mickey Simmons, who had detected movement in the home after opening the door and turned to push his wife off of the front porch as he urged her to run. Watts fired twice with a .38 caliber revolver Simmons had given him for protection while working in Darrow bar and then joined his companions in flight from the home, discarding the weapon on a nearby levy where the police later recovered it. He testified at trial that Mickey Simmons had been abusive to him and his sister and that only weeks before the shooting the victim had put the .45 caliber pistol to his head in a dispute at the Darrow bar. Watts claimed that on the night of the shooting the kitchen light had been on, that Simmons had stepped all the way inside the house and recognized him as his wife's brother and not an intruder, and that Simmons nevertheless took out his .45 automatic and pointed the weapon at him. "When he pointed it at me," Watts told jurors as he explained why he opened fire, "I was thinking about the night at the club he put the gun to my head." The police found Mickey Simmons sprawled dead in the front driveway of his home and Simmons's.45 caliber handgun in the doorway leading from the living room to the kitchen of his home. The police also found at the back of the home eyeglasses inadvertently dropped by Myles as he ran from the scene. That discovery led to the arrests of the defendants and to their interlocking confessions, introduced by the state at trial, consistent with the testimony of all three defendants at trial.
Watts took full responsibility at trial for shooting Simmons after his friends had already bolted from the Simmons home. He told jurors that while Myles and Smith knew Simmons had given him the .38 caliber revolver, they also knew that Watts's mother had confiscated it from her son, and "didn't know I found it." Watts had tucked the gun in his waistband underneath his shirt where it remained concealed until he drew it out in the confrontation with Mickey Simmons. Smith and Myles also testified that they did not know Watts had been armed that night and that they were in full flight from the house through the backyard when they heard the two shots. Smith informed jurors that Jean Simmons had not given them permission to enter the home, but Myles corroborated Watts's testimony about the call earlier that day from his sister, and Jean Simmons, a state witness, told jurors that she had informed Watts that the door "was going to be open for him to get in, change his clothes, do whatever he had to do." In fact, Jean Simmons testified that Watts "had permission to go any time he wanted to go in there. They had my permission to go there." At the same time, Jean Simmons, Myles, and Watts all testified under questioning by the prosecutor that while the defendants may have had the authority to go into the house, they did not have permission to take cash, or anything else, out of the home.
The question of whether the defendants had the authority to enter the Simmons home on the night of the shooting became the lynchpin of the common defense asserted on behalf of all defendants. On the day of trial, the state reduced the charge against the defendants to second degree felony murder, contending that Simmons had died during the course of an aggravated burglary in which all three defendants had participated, although only Watts actually fired the fatal shots. See La.R.S. 14:30.1(A)(2), 1993 La. Acts 496 (defining second degree murder as a homicide committed during the perpetration of certain enumerated felonies, including aggravated *1142 burglary, "even though [the offender] has no intent to kill or to inflict great bodily harm.") Defense counsel argued that whatever their intent, the defendants had obtained the permission of Jean Simmons to enter the home. Because that entry was authorized, even if accompanied by an intent to steal, the defendants had not committed a burglary or any of the other offenses enumerated in the felony murder provisions of the statute. That view of the evidence completely exculpated Smith and Myles, as it was otherwise clear that they did not aid or abet Watts's killing of Simmons. With regard to Watts, counsel argued that because he was inside the Simmons home not as an intruder but as his sister's brother who often stayed in the house, kept clothes there, and had his sister's express permission to enter that night, the defendant retained the right to defend himself when Simmons pulled out his .45 caliber handgun not to safeguard his home but to act on the personal animus that had been building between the two men.
Trial in this case occurred before the effective date of 1997 La. Acts 889, which added art. 517 to the Code of Criminal Procedure and placed on a trial judge in Louisiana in cases of joint representation an affirmative duty to "inquire with respect to such joint representation and [to] advise each defendant on the record of his right to separate representation." Because joint representation of co-defendants by the same counsel "is not per se violative of the constitutional guarantees of effective assistance of counsel," Holloway v. Arkansas, 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978), the court in this case remained free to assume from the lack of notice by the defendants either that no conflict existed, or that they had accepted the risk of any conflict which did exist, unless circumstances were such that the court knew or should have known that a particular conflict existed. Cuyler v. Sullivan, 446 U.S. 335, 347, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980). In the absence of such special circumstances, or timely notice of a conflict, the defendants have the burden of showing post-verdict that an actual conflict existed which adversely affected counsel's performance. Cuyler, 446 U.S. at 349, 100 S.Ct. at 1718.
On the present record, no reviewing court can determine the extent to which counsel may have discussed potential conflicts with the defendants as they prepared this case for a first degree murder trial, and a possible penalty phase at which the relative degrees of the defendants' moral culpability for the victim's death would become an issue, or the extent to which the defendants may have decided to undertake the risks of joint representation because they subscribed, as Smith testified at trial, to a one-for-all and all-for-one philosophy. Nor does the present record allow an appellate court to determine whether counsel's preparation for trial, including possible plea negotiations on behalf of one or more of the defendants and a decision whether to challenge the admissibility of any of the defendants' confessions, may have been adversely affected by joint representation of the defendants. Holloway, 435 U.S. at 491, 98 S.Ct. at 1182 ("[I]n a case of joint representation of conflicting interests the evil ... is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process.") (emphasis in original).
The present record does, however, allow a reviewing court to determine that when the state reduced the charge to second degree felony murder on the morning of trial, thereby eliminating the penalty phase altogether and relieving the prosecution of its burden to prove specific intent to kill or to inflict great bodily harm on Simmons by any of the defendants, the interests of the three defendants become sufficiently aligned that their common defense did not entail sacrificing one defendant to save the others and did not preclude the raising of a plausible defense on behalf of one defendant at the risk of eroding "strength against *1143 common attack." Glasser v. United States, 315 U.S. 60, 92, 62 S.Ct. 457, 475, 86 L.Ed. 680 (1942) (Frankfurter, J., dissenting); see also State v. Morrow, 440 So.2d 98, 103 (La.1983) ("When multiple representation forecloses the use of a plausible defense that might have benefitted one defendant, but would have prejudiced the jointly represented codefendant, the conviction must be overturned, unless there has been an express and knowledgeable waiver of the right to conflict-free counsel.") (emphasis deleted and citation omitted). In the context of a second degree, felony murder prosecution, Myles and Smith could not defend themselves simply by casting full blame on Watts for the murder of Simmons. Given their self-confessed intent to take Simmons's cash, all three defendants became responsible for the victim's murder if a jury determined that they had made an unauthorized and therefore illegal entry onto the premises, no matter how Smith and Myles sought to distance themselves from the fatal shots fired by Watts and without regard to whether they had even been aware that their companion was armed. In felony murder, "the mens rea of the underlying felony [provides] the malice necessary to transform an unintended homicide into a murder." State v. Kalathakis, 563 So.2d 228, 231 (La.1990) (footnotes and citations omitted); see also 2 Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law, § 7.5, pp. 211-12 (1986). Moreover, under general principles of accessorial liability, see La. R.S. 14:24, "all parties [to a crime] are guilty for deviations from the common plan which are the foreseeable consequences of carrying out the plan." 2 La-Fave and Scott, Substantive Criminal Law, § 7.5, p. 212; see also State v. Anderson, 97-1301, p. 3 (La.2/6/98), 707 So.2d 1223, 1224 ("Acting in concert, each man then became responsible not only for his own acts but for the acts of the other."). The risk that an unauthorized entry of an inhabited dwelling may escalate into violence and death is a foreseeable consequence of burglary which every party to the offense must accept no matter what he or she actually intended. See State v. Cotton, 341 So.2d 362, 364 (La. 1976) (if the co-perpetrator in an aggravated burglary was guilty of second degree murder because he shot and killed the victim, then Cotton, "as a principal [in the burglary] was likewise guilty of the same offense."). As we observed in State v. Lozier, 375 So.2d 1333, 1337 (La.1979), "[b]urglary laws are not designed primarily to protect the inhabitant from unlawful trespass and/or the intended crime, but to forestall the germination of a situation dangerous to the personal safety of the occupants.... In the archetypal burglary an occupant of a dwelling is startled by an intruder who may inflict serious harm on the occupant in his attempt to commit the crime or to escape from the house." A homicide committed during flight from an aggravated burglary, or to facilitate flight from the scene, therefore constitutes felony murder. State v. Anthony, 427 So.2d 1155, 1159 (La.1983).
The common defense asserted on behalf of all three defendants, that they had not committed the underlying felony offense of aggravated burglary although they had entered the Simmons home for the specific purpose of stealing any cash they could find, acknowledged these principles by attacking the state's case at its premise. The defense appeared plausible under Louisiana law, which treats unauthorized entry and felonious intent as separate and distinct elements of burglary. La.R.S. 14:60; 14:62. An entry with undeclared felonious intent is therefore not "unauthorized" if it is with the knowing and voluntary consent, express or implied, of the owner or occupant of the premises. Lozier, 375 So.2d at 1336 ("`[A]n entry into a building open to the public at the designated hours and within the designated confines is not an unauthorized entry regardless of the intent of the person so entering.'") (quoting State v. Dunn, 263 La. 58, 267 So.2d 193, 195 (1972)); see also State v. Harper, 246 Kan. 14, 785 P.2d *1144 1341, 1346 (1990) ("Other jurisdictions have concluded that one who enters a building with permission of the owner cannot be guilty of burglary, even if that entry occurred with the intent to commit a felony, because intent is not the only element of burglary.") (discussing Dunn); People v. Graves, 76 N.Y.2d 16, 24, 555 N.E.2d 268, 270, 556 N.Y.S.2d 16, 18 (1990) ("The notion of a secret intent to commit a crime at the time of entry always rendering a consented to entry unlawful eliminates the trespassory element, i.e., the unlawfulness of the entry, by making it coextensive with the intent required to establish a burglary.").
From this common point, keyed to the testimony of Watts and especially that of Jean Simmons, who stated that the defendants all had permission to enter her home, cf. State v. Ortiz, 96-1609, pp. 15-16 (La.10/21/97), 701 So.2d 922, 931-32 ("[E]ven if a person has lawful access to enter a premises himself, he is not empowered to grant lawful authority to another to enter for the purpose of committing a felony."), the defense of Myles, Smith and Watts developed in entirely compatible ways: Smith and Myles were not guilty because, even assuming Watts's claim of self-defense failed, they had not aided or abetted the killing of Simmons and they were otherwise lawfully inside the home; and Watts was not guilty because he too was lawfully in his sister's home with her consent was therefore entitled to claim self-defense when Simmons confronted him at gun point.
We therefore hold that the trial record alone does not support the court of appeal's determination that counsel labored under an actual conflict which adversely affected their performance. Accordingly, the decision below is reversed. To the extent, if any, that the defendants' claim implicates the pre-trial conduct of the case by counsel, that issue is more appropriate for post-conviction proceedings. See Holloway, 435 U.S. at 490, 98 S.Ct. at 1181 ("[I]n this case [joint representation] may well have precluded defense counsel [for one defendant] from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable"); Edens v. Hannigan, 87 F.3d 1109, 1117 (10th Cir.1996) (joint representation created an actual conflict meriting federal habeas corpus relief from state court conviction on grounds, inter alia, that "Edens was the least culpable defendant in this case and his observations regarding his more culpable codefendant [] might have been offered in exchange for a plea agreement with the government"; counsel did not make the effort "because such an arrangement would have been in direct conflict with the [codefendant's] defense."); cf. Burger v. Kemp, 483 U.S. 776, 775-76, 107 S.Ct. 3114, 3121, 97 L.Ed.2d 638 (1987) (asserted conflict of interest did not adversely affect counsel's performance by precluding plea negotiations in a case in which the prosecutor was completely unreceptive to plea offers).
This case is remanded to the court of appeal to address the remaining assignments of error pretermitted on original appeal.
JUDGMENT REVERSED; CASE REMANDED.
JOHNSON, J., dissents.
NOTES
[*] Calogero, C.J., not on panel. See La. S.Ct. Rule IV, Part II, § 3.