880 So.2d 854 (2004)
STATE of Louisiana
v.
Quentin WILEY.
No. 03-KA-884.
Court of Appeal of Louisiana, Fifth Circuit.
April 27, 2004.
*857 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Walter G. Amstutz, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
James A. Williams, Butch Wilson, Gretna, LA, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., MARION F. EDWARDS and WALTER J. ROTHSCHILD.
MARION F. EDWARDS, Judge.
Defendant/appellant Quentin Wiley appeals his conviction of second degree murder (LSA-R.S.14:30.1) and attempted second degree murder (LSA-R.S.14:27, 14:30.1). This is a companion case to State v. Damaris Jackson[1], who was charged in the indictment as a codefendant. Wiley was arraigned and pled not guilty to both charges.
Wiley filed several pre-trial motions, including a Motion to Suppress Confession, Identification, and Physical Evidence. The trial court heard and denied the motion to suppress the confession. Wiley also filed a Motion to Sever Parties, which motion the court heard and took under advisement. That motion was later denied, and subsequently the court heard and denied the motions to suppress evidence and identification.
Wiley and Damaris Jackson were jointly tried by a twelve-person jury on April 9, 10, 11 and 12, 2002. Following trial, the jury returned verdicts of guilty as charged on both counts.
Wiley filed a Motion for New Trial, which was denied by the court. He then moved the court to grant the delay in sentencing provided in LSA-C.Cr.P. art. 873. The court denied the motion and sentenced Wiley that day to life imprisonment at hard labor on Count 1, and forty-nine years at hard labor as to Count 2. The court further ordered that the sentences run concurrently with each other and that *858 both sentences be served without benefit of parole, probation, or suspension of sentence.
Wiley filed a Motion to Reconsider Sentence, which was denied. The state filed a habitual offender bill of information, alleging Wiley to be a second felony offender. The state noticed its intention to enhance Wiley's sentence as to Count 2. Wiley was arraigned as to the habitual offender bill, and denied the state's allegations. Following a habitual offender hearing, Wiley was found to be a second felony offender. On that day the court vacated Wiley's original sentence as to Count 2, and re-sentenced him to ninety-nine years at hard labor, without benefit of probation or suspension of sentence. The court ordered that the enhanced sentence run consecutively to the sentence on Count 1. Wiley appeals.
The evidence and testimony adduced at trial was summarized in our opinion in the companion case of Damaris Jackson. However, due to the nature of the errors alleged in the instant appeal, it is necessary to reiterate the evidence here.

FACTS
Kenyatta Francis testified that, on January 24, 2001, he met with Quentin Wiley (a/k/a "Heat") to discuss the sale of one and one-quarter kilograms of cocaine he (Francis) had in his possession. Wiley told Francis that he knew someone who would buy the cocaine. Francis responded that he didn't want the buyer to know he was selling drugs, and that Wiley would have to "serve" him. That evening, Francis drove a Lexus sports utility vehicle (SUV) to the home of Wiley's girlfriend in the Woodmere Subdivision in Harvey. He was accompanied by a friend, Corey Charles, who was not involved in the planned transaction. Wiley joined the two men, and they set out to locate the buyer.
Following Wiley's directions, Francis drove to the Concordia Apartments on Westwood Drive in Marrero. Wiley exited the vehicle, carrying the cocaine in a plastic garbage bag. Wiley walked a short distance and met with a man Francis later identified as defendant, Damaris Jackson. Jackson and Wiley walked toward one of the apartment buildings and disappeared from view, while Francis and Charles waited in the SUV.
When Wiley failed to return, Francis placed a call to his cellular telephone. Francis' cellular telephone showed that the call was made at 7:11 p.m. He asked Wiley why the transaction was taking so long. Wiley told Francis that the buyer wanted to negotiate some changes in the original agreement. Francis exited the SUV, leaving Charles alone in the vehicle. Jackson approached Francis and told him he would take him to Wiley.
Francis and Jackson walked along the outside of one of the apartment buildings. At this time, Francis did not see Wiley. Francis observed that Jackson flinched nervously each time they passed a doorway. When Francis asked him where they were going, Jackson pointed a gun at him and said, "Give it up." Francis attempted to reach for the gun, but Jackson fired at him. A bullet went through his shoulder and hit his face, and he fell to the ground. Francis testified that Jackson did not take anything from him after he pulled out the gun. Jackson fled on foot, running toward the truck, and Francis heard two more gunshots. Although he did not see what happened, he assumed Jackson was firing at Corey Charles. He did not, however, have firsthand knowledge of who shot Charles. Francis did not see Wiley with a gun, and did not hear Wiley tell Jackson to shoot him.
A nearby resident called police. Francis told an officer at the scene that Heat had *859 set him up, and that Heat's real first name was Quentin. Francis was transported to West Jefferson General Hospital, where his injuries were treated. Francis testified that he did not recover the cocaine, nor did he receive any money. Francis also testified that he identified Wiley and Jackson from a photographic lineup. On cross-examination, Francis agreed that in his initial statement to police a week after the shooting, he did not mention that Jackson had told him to "give it up."
At trial, Deputy Theodore Keelen of the Jefferson Parish Sheriff's Office testified that he went to the 1500 block of Westwood Drive in response to a shooting call. He found Corey Charles lying on the ground, bleeding and gasping for air. He asked Charles what had happened. Charles told him that he was with a guy called Keyana [sic], and then Charles responded that he could not breathe any longer. Deputy Keelen and another officer performed cardiopulmonary resuscitation, and then turned the victim over to the care of emergency medical technicians. Charles was eventually pronounced dead at the scene. The position of bullet casings found at the scene along with Charles' location when found by police indicated a chase had taken place.
Detective Donald Clogher testified that he interviewed Francis after the shooting, and based on information given by him, Wiley was arrested. Subsequently he obtained an arrest warrant for Jackson. Between January 30, 2001 and February 5, 2001, Clogher conducted six tape-recorded interviews with Wiley. Portions of the statements were excised as agreed upon by attorneys, and the tape recordings were all played for the jury at trial. Transcripts of the statements were given to the jury. In the first interview, Wiley stated that he knew Kenyatta Francis, and that he knew who Corey Charles was. (In that first interview, Charles was referred to as "Corey Brown", whose nickname was "Rat".) Wiley denied having been on Westwood Drive on the night of January 24, 2001, insisting that he never goes to that area.
In his second statement taken approximately two hours later, Wiley said he went to 1500 Westwood Drive with Kenyatta Francis, who drove the Lexus truck, and Corey Charles, on January 24, 2001. He and Charles waited in the vehicle while Kenyatta went into an apartment to "holler at" someone about a "deal" he had worked out earlier. Wiley believed the deal involved a drug transaction. Francis called Wiley from his cell phone and told him to come in. Wiley continued to wait in the truck, and Francis exited the apartment some time later with two unknown men wearing hats. Francis was saying he would not give (the men) their money back, and as the men walked toward the vehicle, one of Francis' two companions shot him. Wiley did not know which of the men fired on Francis, but he saw them both holding guns. One had a silver gun, and the other a large, black semi-automatic handgun with a laser sight. Wiley jumped out of the truck and ran. Rat also jumped out. Wiley went to the Woodmere area, to the home of his girlfriend, Gretchen, and later left there in his Corvette.
Wiley made his third statement on February 1, 2001 at 11:35 a.m. This statement was substantially the same as the second, except that Wiley identified the shooter as "Marious," also known as "D." Wiley said Marious was the one who had the .9mm gun with a laser sight. He denied any involvement in a drug transaction.
Wiley's fourth interview took place on February 1, 2001 at 2:45 p.m. Wiley stated that he arranged for Kenyatta Francis and the shooter "Demarious, [sic]" whose last name is either Smith or Jackson, to meet. *860 Damarious wanted to buy a "quarter key" (i.e., kilogram) of cocaine, and Wiley contacted Francis. Wiley accompanied Francis to the Concordia Apartments to sell a quarter key to Damarious. When they arrived at the apartment complex, Wiley sent Francis to meet with Damarious. Francis went into an apartment. When he exited the apartment, shots were fired. Wiley saw Damarious and a second, unknown man. Throughout the incident, Wiley never saw the drugs.
Wiley made a fifth statement at 3:40 p.m. on February 1, 2001. He stated that he went with Francis and Rat to meet Damarious. They were in a Lexus truck and planned to sell a quarter key of cocaine to Damarious, as arranged by Wiley. Wiley jumped out of the truck with the cocaine which was packaged in a black bag. He met with Damarious inside of an apartment and gave him the cocaine. Francis called Wiley on his cellular telephone to ask if he was all right. Wiley told Francis that Damarious was not satisfied with the quality and price of the cocaine. Francis said he wanted to see Damarious to discuss the matter. Wiley stayed in the apartment while Damarious went outside, putting a .9 mm handgun in his jacket. A short time later, Wiley heard shooting. When he left the apartment, he saw Damarious with the .9 mm, with the red laser. Another unidentified man was outside. Wiley ran to a nearby wooded area and later that night, he learned that Francis had been shot.
Wiley made a sixth and final statement on February 5, 2001 at 7:09 p.m. Wiley said Damaris Jackson told him he wanted to buy a quarter key of cocaine. Wiley picked up Jackson, who had a gun obtained from Wiley, and left him at Woodmere. Jackson was to meet him at the Concordia Apartments, and later, Wiley went with Francis and Corey to the Concordia, purportedly to sell cocaine to Jackson. However, when Wiley exited the Lexus SUV with the cocaine, he did not meet with Jackson. Instead, he went to a Nissan Maxima he had parked nearby, and drove it to Woodmere. Wiley then left Woodmere in his Corvette. He took the cocaine with him and hid it. He did not see Jackson after the shootings. Although he changed his story several times during the statement, Wiley ultimately said that he and Jackson planned a "rip-off" before the meeting at the Concordia Apartments.
Jackson made seven separate tape recorded statements on February 2, 2001. He was questioned by Detective Clogher and Detective Donald Meunier. All of the statements, as altered by agreement of the attorneys, were played at trial, and transcripts of those statements were shown to the jurors. The first interview began at 5:02 p.m. Jackson told Detective Clogher that he lives with his girlfriend, Pamela Willis, at 6565 Benedict Street in Marrero. He spent most of the day with her, and later in the evening went to smoke some "weed" with his brother Jerell, a/a/a "Hoops." After about 30 minutes, Jackson returned home. He said he did not know Kenyatta Francis, and that he knew Corey Charles only as a friend of his brother's. Jackson told the detective that he did not go to Westwood Drive on the night of January 24, 2001, had not seen Corey that night, and had no direct knowledge of what had transpired.
Detective Clogher conducted a second tape recorded interview with Jackson at 5:37 p.m. There, Jackson said he heard a rumor that Wiley ("Heat") was seen leaving the scene of the shooting. He had seen Wiley the Saturday after the incident. A week after the shooting, Wiley contacted him through his (Wiley's) girlfriend. Wiley *861 wanted to know whether Jackson had heard anything about the shootings.
The third interview began at 6:35 p.m. According to this account, Jackson was riding a bicycle through the Concordia Apartments complex at the time of the shootings. He heard three shots, but he did not see the incident. Jackson saw a black truck pulling into the last driveway. He drove past the area later with his girlfriend, and they saw police.
Jackson's fourth interview began at 7:25 p.m. He stated that he was walking toward Westwood Drive on the night of January 24, 2001, when he saw a man who he later learned was Francis walking toward him. Addressing someone else, Francis said, "What's up dog?" He saw a black truck, with someone sitting inside of it. Jackson then heard gunfire, and ran. He did not see anyone else in the area, and did not see Quentin Wiley there.
Jackson's fifth statement began at 9:14 p.m. He said he was in the Concordia Apartments complex looking for his girlfriend's car, as she had allowed a man to borrow it. He saw Heat (Wiley), who said he had business in the area. Wiley asked Jackson to go around the corner and let Francis know that Wiley was there. Jackson went to give Francis the message from Wiley, and as he approached Francis, his (Jackson's) pants started to slide down. Jackson grabbed the gun that was tucked into his pants and started to put it in his jacket pocket. Francis tried to grab the gun, and it went off. Jackson shot Francis two to three times. Jackson then fled on foot. He saw someone jump out of Francis' truck and move toward him. Thinking that person had a gun, Jackson fired on him. Jackson stated that his gun is a .40 mm, and that it has a laser sight. He ran home and asked his girlfriend to take him to the St. Thomas Housing Project in New Orleans, where he sold his gun.
A sixth interview began at 10:04 p.m. Jackson said that, on January 24, 2001, Heat told him that he and Francis had some cocaine they were going to sell. Wiley told Jackson to meet him at the Concordia Apartments, and he would get a share of the cocaine. Jackson brought his gun to protect himself. When the two met that night, Wiley asked Jackson to go to Francis' truck and bring Francis to him. Jackson and Francis were walking together, and Francis flinched or jumped. In response, Jackson pulled out his gun and shot Francis. Corey Charles ran from Francis' truck, taking Jackson by surprise. Thinking Charles might have a gun, Jackson fired at him. Jackson did not see Wiley after the incident, and in this statement, declared that he sold his gun for two bags of heroin.
The seventh and final interview began at 10:54 p.m. Jackson stated that Wiley) came to his house on January 23, 2001. Wiley told him that he had a "little hustle" and offered Jackson six thousand dollars worth of cocaine to kill Francis. Jackson said he has a bad heroin habit, and Wiley knew he spent any money he got on the drug. Wiley used this to manipulate him.
On the morning of January 24, 2001, Wiley brought Jackson a gun, and brought him to Concordia earlier in the evening. Jackson then left in his girlfriend's car, and met Wiley at the Concordia Apartments later that evening. Wiley was carrying a bag. Wiley told Jackson to "go call that n____r for me." Jackson found Francis and told him to accompany him to where Wiley was. The plan called for Jackson to take Francis in back of a building and kill him.
As Jackson led Francis to the appointed spot, he tried to pull the gun from his jacket pocket, and found it was stuck. Francis saw this, and became jumpy. *862 Thinking that Francis might have a gun, Jackson fired his gun, shot Francis twice, and fled on foot. He saw someone in the truck and when Charles opened the door, Jackson shot him. Charles tried to run from Francis' vehicle as Jackson fired ten shots at him. Wiley saw Jackson running, and picked him up in a car and took him to his (Jackson's) girlfriend's house. Wiley gave him one hundred dollars that night. Jackson saw Wiley days later, at which time Wiley gave him an additional five hundred dollars. Wiley told Jackson he (Wiley) was wanted by the authorities, and that he planned to turn himself in.
Detective Clogher testified that the search of a residence where Jackson had been disclosed .9, .22, .25, and .32 caliber ammunition, but no .40 caliber rounds were found. No information was developed during the investigation to indicate that Wiley shot or robbed either Corey Charles or Francis, and neither the cocaine nor the gun used in the shooting was ever located.
Dr. Susan Garcia, an expert in forensic pathology, testified that she conducted an autopsy on the body of Corey Charles. She identified four bullet entrance wounds. Two of those wounds had corresponding exit wounds. As to the other two, the doctor recovered projectiles from the body. Two bullets entered from the back, and two from the right side. Three of the wounds were not lethal. The fourth bullet injured the victim's kidney, liver, and right lung. Dr. Garcia testified that organs bleed at a high rate. The liver is particularly vascular, and bleeds profusely when injured. It was the doctor's opinion that the victim bled to death. Dr. Garcia identified State's Exhibits 26 and 27 as the projectiles she removed from Corey Charles' body.
Louise Walzer, an expert in firearms identification and ballistics, examined the spent cartridge casings recovered from the scene and identified them as .40 caliber Speer casings. Walzer also examined State's Exhibits 26 and 27, the bullets recovered from the victim's body. She found that they were also .40 caliber. She testified that all of those items were consistent with being fired from a .40 caliber class weapon, and all of the fired cartridge casings came from the same weapon.
Detective Donald Meunier testified that he collected the evidence recovered from the crime scene, which included several .40 caliber cartridge casings. Investigating officers executed several search warrants in connection with the investigation. However, no gun was ever recovered. Among the items recovered in a search of 4232 Lac Couture Drive, Apartment C in Harvey, where defendant was believed to be staying, were numerous live .9 mm cartridges, as well as .22, .25 and .32 caliber cartridges.
Jackson's fiancée, Pamela Willis, testified on his behalf. She stated she was with Jackson during the entire day on January 24, 2001. She did not know of any conversation he may have had with Wiley. He used heroin on a daily basis, and that night he used heroin starting at around 6:00 p.m. He left her house that evening in her car. On the morning just prior to his arrest, he smoked marijuana.

SUFFICIENCY OF EVIDENCE
Wiley argues that the evidence at trial was insufficient to prove that he was a principal to either the second degree murder of Corey Charles or the attempted second degree murder of Kenyatta Francis. When issues are raised on appeal as to sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine sufficiency of the evidence. When the entirety of the evidence, including inadmissible evidence *863 which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any issue regarding trial errors become moot.[2] For the foregoing reasons, Wiley's second assignment of error will be addressed first.
The constitutional standard for testing the sufficiency of the evidence, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.[3] When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.[4] When circumstantial evidence is used to prove a case, the trial judge must instruct the jury that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." LSA-R.S. 15:438.
On appeal, the reviewing court "does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events." State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1020. Rather, the court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. Id.[5]
As to the murder of Corey Charles, from the evidence produced by the state, and from the prosecutors' closing arguments, the state apparently proceeded under both the theory of felony murder based on armed robbery or attempted armed robbery, and the theory of specific intent. Wiley argues the state did not produce sufficient evidence to prove second degree murder under either theory.
He urges that the state failed to prove he had the specific intent to kill or inflict great bodily harm, as required under LSA-R.S. 14:30.1 A(1). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as a fact, but may be inferred from the circumstances and actions of the accused, as well as the extent and severity of the victim's injuries.[6] LSA-R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Only those persons who knowingly participate in planning or executing a *864 crime are principals to that crime. Mere presence and subsequent flight from a crime scene is not enough to make one a principal.[7] An individual may be convicted only for the crimes for which he personally has the requisite intent.
Jackson told police that Wiley instructed him to kill Kenyatta, and offered him six thousand dollars worth of cocaine to do so. Jackson stated that Wiley supplied him with a gun. In his own final statement to police, Wiley said he obtained a gun from a friend and gave it to Jackson on January 23, 2001. The gun was a .9 mm with a "red beam on it." We note that while there is evidence that Wiley intended harm to Francis, there is nothing to indicate that he instructed Jackson to kill or to harm Charles. Jackson admitted to police that he shot Charles in order to facilitate his escape from the scene.
However, under general principles of accessorial liability, "all parties [to a crime] are guilty for deviations from the common plan which are foreseeable consequences of carrying out the plan ... Acting in concert, each man then [becomes] responsible not only for his own acts but for the acts of the other."[8] Kenyatta Francis testified that he arrived at the Concordia Apartments with Wiley and Charles. Wiley knew that Charles was waiting in Francis' parked vehicle. It is an obvious inference that Wiley was aware of the likelihood that Charles would witness whatever occurred between Jackson and Francis. Considering that Wiley knew Jackson had a weapon, and in fact admitted to supplying Jackson with the gun, we think it clear that Charles' injury or death was a foreseeable consequence of the plan Wiley and Jackson devised.
Based on the foregoing, we find that the state proved Wiley had the requisite intent to kill or inflict great bodily harm, and the evidence was sufficient to support specific intent murder.
To prove the attempted second degree murder of Kenyatta Francis, the state was required to prove specific intent to kill and the commission of an overt act in furtherance of that goal.[9] Wiley asserts that the state failed to prove he had the specific intent to kill Francis.
He correctly urges that the only direct proof of his intent to kill Francis was Jackson's last statement, in which he said Wiley offered him six thousand dollars worth of cocaine to kill Francis. Wiley argues that Jackson's statement is unreliable.
The reviewing court is not permitted "`to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.'"[10] "It is not the function of an appellate court to assess credibility or re-weigh the evidence."[11] The jury apparently put some credence in Jackson's admission that he shot Kenyatta Francis after Wiley instructed him to do so. Jackson's statement is supported by Wiley's own admission that he obtained a gun for Jackson, and that he (Wiley) took Francis' cocaine.
*865 We find that all of the evidence, taken together, was sufficient to prove attempted second degree murder.
Under felony murder, the state must prove the commission of the underlying felony or the attempt thereof. A defendant need not possess specific intent to kill or inflict great bodily harm to be a principal to a second-degree felony murder.[12]
The state sought to prove Charles was killed during the commission of an armed robbery. Wiley argues that there was no reliable evidence to support the state's assertion that he and Jackson planned an armed robbery, or that an armed robbery occurred. Wiley cites Detective Clogher's testimony that he did not charge him with the robbery of Kenyatta Francis. Moreover, Deputy Keelen, the first officer at the scene, testified there was no evidence that Corey Charles had been robbed.
In determining whether there was a felony murder, or attempted felony murder, the pertinent questions are whether Wiley was a principal to armed robbery or attempted armed robbery, and if so, whether Corey Charles was killed during the commission of that armed robbery. Armed robbery is defined by LSA-R.S. 14:64 as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another by use of force or intimidation, while armed with a dangerous weapon." LSA-R.S. 14:27(A) provides:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
There was considerable evidence to show there was a planned cocaine heist. Wiley told police in his sixth statement that, prior to the meeting at the Concordia Apartments, he and Jackson had formulated a plan to "rip off" Francis' cocaine. Jackson suggested that they "jack this n____r," meaning Jackson intended to rob Francis of his cocaine. Wiley told Jackson that was a bad idea, and Jackson responded, "[M]an, f___ that." Under Jackson's scenario, he and Wiley would share the cocaine. However, Wiley cheated Jackson by taking all of the cocaine.
Jackson's story was that Wiley enlisted him to kill Francis in exchange for a share of Francis' cocaine. Both Jackson and Wiley told police that Wiley supplied Jackson with a gun.
Kenyatta Francis testified that he gave Wiley cocaine with the understanding that Wiley would find a buyer, and that he (Francis) would receive the proceeds of the sale. When they arrived at the Concordia Apartments, Wiley left the vehicle and met with Jackson. Francis never saw Wiley or the cocaine again, nor did he receive payment for the drugs.
Francis testified that when he went with Jackson to discuss the cocaine transaction, Jackson pointed a gun at him and told him to "give it up." Francis believed Jackson intended to rob him. That act alone is sufficient to constitute an attempted armed robbery.[13]
Although Francis willingly gave his cocaine to Wiley the evidence showed Wiley *866 and Jackson used "force and intimidation" (i.e., the shooting) in order to keep it. The Louisiana Supreme Court has held that a robbery is committed, not only if the perpetrator uses force or intimidation to "take" possession of the property, but also if force or intimidation is used to retain possession immediately after the taking, or to carry away the property, or to facilitate escape.[14]
There was no evidence at trial that Wiley and Jackson attempted to rob Charles, although they clearly intended and attempted the robbery of Francis. However, Charles' murder is connected to the robbery insofar as Jackson shot Charles to facilitate his escape. It appears from Jackson's seventh taped statement that Jackson thought it necessary to shoot Charles in order to keep him from shooting him or reporting his attack on Francis to authorities.
The Louisiana Supreme Court has affirmed a defendant's second degree felony murder conviction, which was based on an underlying burglary offense.[15] The court held:
In felony murder, "the mens rea of the underlying felony [provides] the malice necessary to transform an unintended homicide into a murder." ... Moreover, under general principles of accessorial liability, see La.R.S. 14:24, "all parties [to a crime] are guilty for deviations from the common plan which are the foreseeable consequences of carrying out the plan."... ("Acting in concert, each man then became responsible not only for his own acts but for the acts of the other."). The risk that an unauthorized entry of an inhabited dwelling may escalate into violence and death is a foreseeable consequence of burglary which every party to the offense must accept no matter what he or she actually intended. See State v. Cotton, 341 So.2d 362, 364 (La.1976) (if the co-perpetrator in an aggravated burglary was guilty of second degree murder because he shot and killed the victim, then Cotton, "as a principal [in the burglary] was likewise guilty of the same offense."). As we observed in State v. Lozier, 375 So.2d 1333, 1337 (La.1979), "[b]urglary laws are not designed primarily to protect the inhabitant from unlawful trespass and/or the intended crime, but to forestall the germination of a situation dangerous to the personal safety of the occupants.... In the archetypal burglary an occupant of a dwelling is startled by an intruder who may inflict serious harm on the occupant in his attempt to commit the crime or to escape from the house." A homicide committed during flight from an aggravated burglary, or to facilitate flight from the scene, therefore constitutes felony murder. State v. Anthony, 427 So.2d 1155, 1159 (La.1983).
The Fourth Circuit has applied the principles in Smith to a felony murder based on armed robbery, finding: "[I]t is foreseeable that an armed robbery victim may be shot during the perpetration of an armed robbery ...[16]
Because the evidence was sufficient to prove that Jackson attempted to kill Francis and did kill Charles during the commission of an armed robbery,[17] which robbery was planned with Wiley, the state proved that Wiley was guilty of second degree felony murder.

*867 MOTION TO SEVER AND ADMISSION OF CO-DEFENDANT'S STATEMENTS
Wiley also urges error in the trial court's rulings denying the motion to sever the trial of the defendants, in failing to deny the admission of his co-defendant's statements into evidence, and failing to grant the mistrial motion, which errors resulted in a violation of Jackson's Confrontation Clause rights.
Both Wiley and Jackson filed motions to suppress their confessions, which motions were denied. Wiley filed a Motion to Sever Parties, arguing he should receive a separate trial because, his own and Jackson's defenses were mutually antagonistic. The trial court denied the severance motion.
Wiley complains that the trial court deprived him of his Sixth Amendment right of confrontation by allowing the admission of inculpatory statements made by his co-defendant, Jackson, when he (Wiley) did not have the opportunity to cross-examine Wiley.
On the second day of trial, out of the jury's presence, the attorneys representing Jackson and Wiley informed the court that their clients would not be testifying. Wiley's counsel stated that, if Jackson's police statements were admitted in evidence without his being given an opportunity to cross-examine Jackson, he would move for a mistrial.
By agreement of the parties, Wiley's and Jackson's statements were redacted to eliminate some potentially prejudicial material. Nothing was redacted from Wiley's first statement. Two pages were removed from each of statements two and four. A sentence or phrase was removed from each of statements three, five, and six. The parties agreed that Jackson's first statement would be offered without any changes. Approximately three lines were removed from Jackson's second statement. The parties agreed to remove nothing from the third, fourth, and fifth statements. A reference to first degree murder was ordered removed from the sixth statement. Wiley's attorney moved the court to remove from Jackson's seventh statement any reference to him that would tend to inculpate Wiley. The record is not clear as to what, if anything, was eliminated from that statement prior to its admission, but it is clear that all references to Wiley were not removed.
When the state offered the tapes and transcripts, the defense objected to their admission in evidence. The objections were overruled. At the conclusion of the state's case, both Jackson and Wiley informed the court they would assert their Fifth Amendment rights if they were called to testify. Wiley moved for a mistrial on grounds that Jackson had implicated him in his seventh statement, and that he would be deprived of his confrontation rights if he were not given the opportunity to cross-examine. Jackson adopted Wiley's motion. The court denied a mistrial.
Wiley argues that the only evidence at trial that directly inculpated him was Jackson's seventh statement. He further argues that the admission of the statement constitutes reversible error, and moves this Court to vacate his convictions and remand the case for a new trial.
La.C.Cr.P. art. 704 provides that jointly indicted defendants shall be tried jointly unless the state elects to try them separately, or the court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
Whether justice requires a severance must be determined by the facts of each case. State v. Prudholm, 446 So.2d 729, *868 741 (La.1984); State v. Foret, 96-281 (La.App. 5th Cir.11/14/96), 685 So.2d 210, 224. A defendant is not entitled to a severance as a matter of right, but the decision is one resting within the sound discretion of the trial court. Prudholm, 446 So.2d at 741; State v. Cedrington, 98-253 (La.App. 5th Cir.12/16/98), 725 So.2d 565, 577, writs denied, 99-190 La.00-205 [(La.6/4/99)], 743 So.2d 1249 and 99-431 (La.6/25/99), 745 So.2d 1182. A denial of a motion to sever will not be overturned on appeal absent a clear abuse of discretion. Prudholm, 446 So.2d at 741; Cedrington, 725 So.2d at 577.
A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the state. Prudholm, 446 So.2d at 741; Cedrington, 725 So.2d at 577. The Defendant bears the burden of proof in such a motion. Mere unsupported allegation that defenses will be antagonistic is not sufficient to require a severance. Prudholm, 446 So.2d at 741; Foret, 685 So.2d at 224. Furthermore, the fact that each defendant has pointed a finger at the other does not make defenses automatically antagonistic. Prejudice must be shown if defendants are to receive separate trials. State v. Williams, 416 So.2d 914, 916 (La.1982); Cedrington, 725 So.2d at 577.[18]
We note that in ordering severance of defendants, our Supreme Court has cautioned:
Prejudice may occur in a joint trial "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." Zafiro v. United States, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1933)[(1993)] (citing Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). The Supreme Court has not yet delineated those circumstances under which a codefendant's statement may be directly admissible against the defendant. It has made clear that such statements are presumptively unreliable to the extent that they incriminate the defendant. Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), and that they remain inadmissible at a joint trial even when the defendant has given his own "interlocking" statement. See Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987) ("[W]here a nontestifying co-defendant's confession incriminating the defendant is not directly admissible against the defendant ... the Confrontation Clause bars its admission at their joint trial....").[19]
The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront the witnesses against him. The primary purpose behind this right is to secure for the defendant the opportunity for cross-examination.[20]
The basis for not admitting the statement of a co-defendant which is sufficiently against his penal interest is the *869 longstanding judicial perception that custodial confessions of non-testifying, unavailable co-defendants are inherently suspect and presumptively unreliable as substantive evidence against defendant.[21]
However, the Supreme Court made it clear in Lee that the presumption of unreliability is not absolute. In a critical passage, the Court observed that "[i]f those portions of the co-defendant's purportedly `interlocking' statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment." Lee, 476 U.S. at 545, 106 S.Ct. 2056. In Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), the Supreme Court addressed the admissibility of the confession of a co-defendant in the context of the hearsay exception provided by F.R. Evid. 804(b)(3) for declarations against penal interest. Williamson's co-defendant was called by the state, but refused to testify at trial, and the prosecution was allowed to admit his entire confession. The Supreme Court held that "the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." Id. at 600-601, 114 S.Ct. 2431. Accordingly, while some parts of a co-defendant's confession may be admissible at a joint trial, under Williamson, the confession must be evaluated, and only those portions which are self-inculpatory may be admitted. Id.

Under the law and jurisprudence presented above, it appears that Jackson's seventh statement implicating Wiley in a murder plot was inadmissible. However, the jury was instructed that although the defendants were being tried together, they were to consider the evidence against each individually. The jury was further instructed on the law of principals. In the present case, Wiley admitted that at the Concordia Apartments, it was agreed there would be a "rip off" of the cocaine, and Wiley further admitted he had earlier supplied the weapon to Jackson. Considering these admissions, and completely disregarding Jackson's implication of a murder plot, the jury could reasonably have concluded that Wiley was a principal to the armed robbery of Francis. Further, there was sufficient evidence to prove that Jackson had the requisite intent to kill or inflict great bodily harm.[22] Under the principle of accessorial liability, it was reasonable to conclude that Wiley was guilty of the murder. The risk that an armed robbery, or any robbery, may escalate into violence and death is clearly a foreseeable consequence which every party to the offense must accept no matter the intent.
As to the requirement of specific intent in the attempted murder of Francis, disregarding Jackson's statement, we note that in order to support a conviction for attempted murder, only specific intent to kill is sufficient.[23] In State v. Mitchell, supra, the defendant was found guilty of attempted first degree murder where he gave a gun to the shooter, telling *870 him if he was not going to use it, he should return the gun to the defendant. The defendant urged that the jury could not have reasonably negated the hypothesis that he only intended the shooter to fire the gun into the air. The Supreme Court found there was sufficient evidence to prove the necessary intent. In so doing, it was held that the reviewing court must assure that the jurors did not speculate where the evidence is such that reasonable jurors must have a reasonable doubt.[24]
The jury is the ultimate factfinder of "whether a defendant proved his condition and whether the state negated that defense." The reviewing court "must not impinge on the jury's factfinding prerogative in a criminal case except to the extent necessary to guarantee constitutional due process." ... (citing State v. McKeever, 407 So.2d 662, 665 (La. 1981)). Therefore, in order for a reviewing court to reverse a conviction based on an alternative hypothesis of innocence, the court must find that the jury could not have negated a potential alternative hypothesis for the defendant's action because specific intent to kill was not proven.
The determination of whether the requisite intent is present in a criminal case is for the trier of fact. In the present case, Francis testified that he saw Wiley meet with Jackson at the Concordia Apartments and walk off together. Later, in response to a call placed to Wiley, Jackson came back to take Francis to Wiley. Although Wiley stated he did not meet with Jackson that night, over the course of his several ever-changing statements, Wiley corroborated this testimony, saying that he met with Jackson, gave him the cocaine, and then sent Jackson, to whom he had given a gun, to meet with Francis. We find from this evidence that the jury could have reasonably concluded that Wiley had the requisite intent.
Moreover, from the conflicting voluntary statements Wiley gave to the police, an inference of a "guilty mind" can be drawn.[25] A finding of purposeful misrepresentation reasonably raises the inference of a "guilty mind", just as in the case of "flight" following an offense or the case of a material misrepresentation of facts by a defendant following an offense.[26] "Lying" has been recognized as indicative of an awareness of wrongdoing.[27] Because of the untruthful statements concerning the shooting, it would not have been unreasonable for the jury to infer that Wiley was guilty of the crime charged.
Confrontation errors are subject to a harmless error analysis.[28] In the present matter, any error in the admission of Jackson's statement was harmless. Further, for these same reasons, the defenses are not mutually antagonistic, as Wiley's culpability in the armed robbery was supported by his own statements. Under these circumstances, a severance was not required, and there was thus no basis for a mistrial. This assignment of error is without merit.

PATENT ERROR
The record was reviewed for errors patent.[29]
*871 LSA-C.Cr.P. art. 930.8 provides that a defendant has two years from the date "the judgment of conviction and sentence become final" within which to file a post-conviction relief application. The article requires that the trial judge inform a defendant of the prescriptive period at the time of sentencing. In the instant case, the judge instructed Wiley that he would have "two years from today's date to file post conviction relief." (Emphasis supplied). We therefore order the trial court to supply Wiley with written notice of the prescriptive period under Article 930.8, and to file written proof of such notice in the record.[30]
The trial judge imposed Wiley's habitual offender sentence without benefit of probation or suspension of sentence. However, the underlying statute, LSA-R.S. 14:30.1, requires that a sentence for attempted second degree murder be served without benefit of parole, probation, or suspension of sentence. When a defendant is sentenced as a habitual offender, "`[t]he penalty increase is computed by reference to the sentencing provisions of the underlying offense. Similarly, the conditions imposed on the sentence are those called for in the reference statute.'"[31] Pursuant to LSA-R.S. 15:301.1, the sentence is deemed to contain the required restriction.[32]
For the foregoing reasons, the conviction is affirmed. The matter is remanded for purposes stated hereinabove.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] State v. Damaris Jackson, 03-KA-0883 (La. App. 5th Cir. 4/27/04), 880 So.2d 841, 2004 WL 895833.
[2] State v. George, 95-0110, p. 6 (La. 10/16/95), 661 So.2d 975, 978; State v. Conner, 02-363, p. 7 (La.App. 5 Cir. 11/13/02), 833 So.2d 396, 401, writ denied, 02-3064 (La.4/25/03), 842 So.2d 396.
[3] Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291; State v. Williams, 99-223 (La.App. 5 Cir. 6/30/99), 742 So.2d 604, 607.
[4] State v. Williams, supra.
[5] State v. Mitchell, 99-3342, p. 7 (La. 10/17/00), 772 So.2d 78.
[6] State v. Keating, 00-51 (La.App. 5 Cir. 10/18/00), 772 So.2d 740, 743, writ denied, 00-3150 (La.10/12/01), 799 So.2d 494.
[7] State v. Wright, 01-0322, p. 9 (La.12/4/02), 834 So.2d 974, 983, cert. denied, ___ U.S. ___, 124 S.Ct. 82, 157 L.Ed.2d 62 (2003); State v. Terrick, 03-515, p. 7 (La.App. 5 Cir. 9/30/03), 857 So.2d 1153, 1157.
[8] State v. Smith, 98-2078, p. 7 (La.10/29/99), 748 So.2d 1139, 1143.
[9] State v. Girod, 94-853, pp. 5-6 (La.App. 5 Cir. 3/15/95), 653 So.2d 664, 668.
[10] State v. Mercantel, 00-1629, p. 9 (La.4/3/02), 815 So.2d 50, 56 (quoting State v. Mussall, 523 So.2d 1305, 1311 (1988)).
[11] State v. Mercantel, supra (citation omitted).
[12] State v. Hill, 98-1087, (La.App. 5 Cir. 8/31/99), 742 So.2d 690, 696, writ denied, 99-2848 (La.3/24/00), 758 So.2d 147.
[13] See State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181, 186-187.
[14] State v. Meyers, 620 So.2d 1160, 1163 (La. 1993).
[15] State v. Smith, supra.
[16] State v. Wix, 02-1493 (La.App. 4 Cir. 1/15/03), 838 So.2d 41, writ denied, 03-0678 (La. 10/17/03), 855 So.2d 756.
[17] See State v. Damaris Jackson, supra.
[18] State v. Quest, 00-205 (La.App. 5 Cir. 10/18/00), 772 So.2d 772, writ denied 00-3137 (La. 11/2/01), 800 So.2d 866.
[19] State v. Johnson, 96-0959 (La.6/28/96), 675 So.2d 1098.
[20] Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); State v. Jones, 02-267, p. 4 (La.App. 5 Cir. 7/30/02), 824 So.2d 514, 516, writ denied, 02-2518 (La.6/27/03), 847 So.2d 1254.
[21] State v. Taylor, XXXX-XXXX (La.1/14/03), 838 So.2d 729, citing Lee v. Illinois, supra; Bruton v. United States, supra; Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).
[22] See State v. Damaris Jackson, supra.
[23] State v. Hongo, 96-2060, p. 2 (La.12/2/97), 706 So.2d 419, 420; State v. Mitchell, XXXX-XXXX (La.10/17/00), 772 So.2d 78.
[24] Id.
[25] See State v. Mitchell, supra.
[26] See State v. Mitchell supra, citing State v. Davenport, 445 So.2d 1190 (La.1984).
[27] Id.
[28] See State v. Williams, XXXX-XXXX (La.4/9/03), 844 So.2d 832; State v. Robinson, XXXX-XXXX (La.5/17/02), 817 So.2d 1131; State v. Smith, supra.
[29] LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
[30] See, State v. Stelly, 98-578, p. 6 (La.App. 5 Cir. 12/16/98), 725 So.2d 562, 564.
[31] State v. Fletcher, 03-60, p. 13 (La.App. 5 Cir. 4/29/03), 845 So.2d 1213, 1222, (quoting State v. Bruins, 407 So.2d 685, 687 (La. 1981)).
[32] State v. Rogers, 03-276, pp. 11-12 (La.App. 5 Cir. 6/19/03), 850 So.2d 838, 845, writ denied, 03-2137 (La.1/30/04), 865 So.2d 73.