COURT OF APPEAL, THIRD CIRCUIT
JAK 08-346

STATE IN THE INTEREST OF

D. A.

**********

APPEAL FROM THE
JEANERETTE CITY COURT
PARISH OF IBERIA, NO. 2116
HONORABLE CAMERON B. SIMMONS, CITY COURT JUDGE

**********

**BILLY HOWARD EZELL
JUDGE**

**********

Court composed of Oswald A. Decuir, Michael G. Sullivan, and Billy Howard Ezell, Judges.

**ADJUDICATION AFFIRMED; REMANDED WITH INSTRUCTIONS.**

**Walter James Senette, Jr.**
**Assistant District Attorney**
**Sixteenth Judicial District Court**
**5th Floor, Courthouse Building**
**Franklin, LA 70538**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Margaret Smith Sollars**
**LA Appellate Project**
**513 Country Club Blvd.**
**Thibodeaux, LA 70301-3711**
**(985) 446-2618**
**Counsel for Defendant/Appellant:**
**D. A.**

**EZELL, JUDGE.**

The State of Louisiana filed a petition for delinquency in Jeanerette City Court contending the Juvenile, D.A., should be adjudicated a delinquent in that he committed an aggravated burglary, in violation of La.R.S. 14:60. On November 15, 2007, the Juvenile appeared in open court and entered a denial to the charge. On December 20, 2007, the city court heard evidence and found D.A. to be a delinquent child.[1] On January 24, 2008, the court rendered a disposition, remanding D.A. to the custody of the State of Louisiana for one year with a recommendation for non-secure placement with the Office of Youth Development.

The Juvenile now appeals his adjudication and disposition.

## FACTS

The State alleged that three juveniles entered the residence of the Iden family in Jeanerette without permission, while D.A. stood lookout outside the residence. Afterwards, the Idens discovered that a pistol was missing.

## ASSIGNMENT OF ERROR NUMBER ONE

The Juvenile contends there was insufficient evidence to prove he was guilty of unauthorized entry of an inhabited dwelling. This court has previously explained:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing

---

[1]Jeanerette City Court exercised its juvenile jurisdiction. La.Ch.Code art. 302(4).

1

*State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

"In a juvenile proceeding, the state's burden of proof is the same as in a criminal proceeding against an adult--to prove beyond a reasonable doubt every element of the offense alleged in the petition." *State ex rel. D.P.B.*, 02-1742, p.4 (La. 5/20/03), 846 So.2d 753, 756.

D.A. was adjudicated a delinquent based on the offense of unauthorized entry of an inhabited dwelling, which is defined in La.R.S. 14:62.3 as follows:

> A. Unauthorized entry of an inhabited dwelling is the intentional entry by a person without authorization into any inhabited dwelling or other structure belonging to another and used in whole or in part as a home or place of abode by a person.

At the adjudication proceeding, Mr. Iden, the owner of the home that was burglarized, testified that on September 19, 2007, he and his wife were working in his shop when his daughter, Sydney, came and told them that four boys had pushed their way into the home asking where her father's guns were kept. The following day, the Iden home was burglarized and Mr. Iden's 9 mm pistol was taken from his bedroom closet. Mrs. Iden testified that only the gun was taken from the house; the money and jewelry in the house were left untouched. Mr. Iden testified that Sydney was able to point out one of the boys to Officer Terrence Moore of the Jeanerette Police Department, which then enabled Officer Moore to find out who else was involved. Mr. Iden testified he never gave any of the juveniles authority to enter his residence and take the weapon.

Officer Moore testified that he responded to a burglary complaint on September 20, 2007, at the Idens' home at 219 Deslatte Street. Officer Moore testified that his

2

investigation revealed that the point of entry was a door underneath the carport, which had been pried open. Inside the house, a bedroom was "out of place" and "thrown around," and the contents of the closet where the gun was kept had been pulled out. Officer Moore testified that Mr. Iden informed him that on the day prior to the incident, four males came inside the residence and asked Sydney where her father's guns were. Sydney indicated to Officer Moore that she knew the subjects that came to her house the day before and "she pointed toward Time Street, where they stayed at." One person she identified in particular was M.L. Officer Moore testified he questioned M.L. about one of his friends who had designs in his hair, and M.L. indicated that person was D.J., "who stays on Time Street." D.J. was questioned and confessed that he, N.L., M.L., and D.A. broke into the Idens' residence to take the handgun. According to Officer Moore, D.J. stated that D.A. stayed outside the residence by the fence, acting as a lookout, while the other three entered the home. According to Officer Moore, D.J. stated it was N.L.'s idea to break in, and, at some point, something spooked D.J., and he ran out of the residence, leaving M.L. and N.L. in the bedroom from which the gun was missing.

D.J. testified at the adjudication hearing prior to the introduction of his recorded statement. D.J. testified that when they first went to the house, he asked Mr. Iden's daughter if they could jump on the trampoline, and she told him they could not because she had a new dog. When D.J. asked to speak to her father, Sydney said that they could not come in because they had a lot of stuff in the house, like guns. D.J. asked to see them, but Sydney told them they could not. The boys left at that point. When D.J. was asked about his second visit to the house, he testified as follows:

Mr. Senette:    . . . Tell the Judge what happened the second time when you went back with each one of the three defendants.

. . . .

3

| | |
|---|---|
| Mr. Senette: | No, not that time. The time you went back in to get the gun, what happened? |
| D.J.: | We were knocking on the door to see if somebody was coming, that's when we tried to get in and that's when we took off running, cause I thought someone was coming. And that's when we all took off. They all followed me. |
| Mr. Senette: | Who went inside the house, the second time? |
| D.J.: | I don't know. |
| Mr. Senette: | Do you remember telling Officer Moore that M.L. and uh, went inside of the house? You remember telling him that? |
| | You remember telling him that M.L. went inside the house and N.L. went inside the house looking for the gun and that's the reason you all went back. |
| D.J.: | No, sir. |
| Mr. Sennette: | Your voice is on this tape saying that. Now, you have got to tell us the truth. I know it's difficult when you got these three defendants here who are you're "[sic]"friends. |
| D.J.: | I don't remember saying that. |
| Mr. Sennette: | Did you tell Officer Moore that N.L. and M.L. went inside the house to look for that gun while Mr. D.A. was outside? |
| D.J.: | We were trying to open the door. That's when . . . |
| Mr. Senette: | Who tried to open the door? |
| D.J.: | N.L.. |
| Mr. Senette: | And how did he try to open the door? |
| D.J.: | He was just pushing it and that's when I looked back and I saw somebody running and I just ran and then they all followed. |

. . . .

4

| | |
|---|---|
| Mr. Sennette: | But ya'll were going over there to try to get inside to find those guns?  Correct? |
| D.J.: | Yes, sir. |
| . . . . | |
| Mr. Senette: | Did you ever see N.L. with a gun, or M.L. with a gun? |
| D.J.: | No, sir. |
| Mr. Senette: | Did you ever see either one of them with bullets? |
| D.J.: | No, sir. |
| Mr. Senette: | You didn't tell Officer Moore you saw them with some bullets. |
| D.J.: | . . . inaudible . . . |
| Mr. Senette: | Denied, you didn't say that on the tape? |
| D.J.: | I never saw, no, that was before that I said I saw them with bullets.  Before that. |

Contrary to D.J.'s testimony at the adjudication hearing, in his statement, which was introduced in evidence at the close of the hearing, he admitted to his and the other three juveniles' involvement in the incident.  In D.J.'s statement, he essentially recounted the same facts regarding the first visit to the Iden home when he, N.L., M.L., and D.A. were not allowed to see Mr. Iden's gun.  However, D.J.'s account of the events that happened the following day differed significantly from his testimony at the adjudication proceeding.  The following excerpt from the transcript of D.J.'s taped statement reveals what occurred and the extent of D.A.'s involvement in the September 20, 2007, incident:

| | |
|---|---|
| Officer Moore: | Ok, well what happened to day [sic]? |
| D.J.: | We jumped the fence. . . |
| Officer Moore: | Who is we? |
| D.J.: | Me, N.L., M.L. and |

5

| | |
|---|---|
| Officer Moore: | Say their names, it was you, who? |
| D.J.: | N.L., D.A., M.L., D.A. said he wasn't. . . go over there and stayed because of the fence and that's when [N] and them tried to open the shed. |
| Officer Moore: | Ok, and what happened when they tried to open the shed? |
| D.J.: | N.L. tried to open the shed. . . and that's when we started running and then. . . going by the door, and that's when we took out running and we was by the track and they came back to meet us. And I asked him what he had and he said nothing, but he had bullets. |
| Officer Moore: | How many bullets did he have? |
| D.J.: | Probably five of them. |
| Officer Moore: | What kind of bullets? |
| D.J.: | Some kind of real small bullets. |
| Officer Moore: | So, who went inside the house? |
| D.J.: | N.J. . . . had opened the door. . . that's when I went up in there. |
| Officer Moore: | So, when did N.L. open the door, before ya'll ran to the track? |
| D.J.: | That's when I went up in there[.] |
| Officer Moore: | Yes, no. |
| D.J.: | Yes. |
| Officer Moore: | So, how N.L. opened the door? |
| D.J.: | I don't know, I just, when we ran, he stayed there. |
| Officer Moore: | Ok. |
| D.J.: | And that's when. . . |
| Officer Moore: | Ya'll left him there, then ya'll went back to the house again? |
| D.J.: | Yeah, to go check on him. |

| | |
|---|---|
| Officer Moore: | Alright, and when ya'll go there, what, the door was open? |
| D.J.: | And that's when I went in. |
| Officer Moore: | So, who all went in? |
| D.J.: | Just me and N.L. and M.L. said they wasn't going in. |
| Officer Moore: | So, just you went in the house. |
| D.J.: | No, me and M.L. and little N.L. was already up in there, and D. A. said he didn't go up in there. And that's when he went up in there. |
| Officer Lewis: | D. A. said he wasn't. . . |
| D.J.: | . . .inaudible. . . |
| Officer Moore: | So who went in there, just you M.L. and little N.L.. |
| D.J.: | D. A. said he didn't go in there. |
| Officer Moore: | Where he stayed at? |
| D.J.: | He like. . . up by that thing[.] |
| Officer Moore: | Just watching? |
| D.J.: | And we went up in there and that's when. . .was making all that noise and they were looking for that stuff and that's when I just ran and they started running. . .and them people just pulled up. Then when we pulled up that's when we say the police riding around and that's when I. . .by Jack house and then I went by D. A. house and me and him. . . inaudible. |
| Officer Moore: | Alright, so who took the gun out the house? |
| D.J.: | N.J., it was little N.L., cause he had the bullets. I don't know who took it though cause he had bullets. |
| Officer Lewis: | Did he ever say anything about taking the gun? |
| D.J.: | He said he wanted the gun. He said was gonna go get the gun. I don't know if he took the gun or not. . . .inaudible. . . |

7

| | |
|---|---|
| Officer Moore: | Alright, what room ya'll was searching? Was ya'll just searching the front room, the bedroom? |
| D.J.: | . . .inaudible. . .like when as soon as you open the door, right there. |
| Officer Moore: | Ya'll went into the closet? |
| D.J.: | . . .inaudible. . . |
| Officer Moore: | So what room you searched? |
| D.J.: | I was just looking at in the gun thing, in the gun thing. . .inaudible. . .that's when I, that's when I . . . inaudible. . . |
| Officer Moore: | So where was M.L. and N.L. doing [sic]? |
| D.J.: | We were all looking. . .inaudible. . .and that's when I heard somebody coming and then I hurried up. . . inaudible. . .the people had just pulled up and that's when ran on the track and. . .just looked at the bullets. |
| Officer Moore: | So, who what made ya'll want to go to those people house knowing that them people was home. Ya'll know ya'll broke into people house? |
| D.J.: | No, I didn't know, I never tried to break in, N.L. was the only one. |
| Officer Moore: | So, N.L. broke in the house and ya'll went inside right? Yes, no[?] |
| D.J.: | Yes. |
| Officer Moore: | That was a yes? |
| D.J.: | Yes and that's when he showed me the bullets and that's when I went by D.A. house. Cause D. A. said he wasn't going in the house and he stood back. |
| . . . . | |
| Officer Moore: | Alright. So, what made ya'll go back to the house, ya'll just plan to go back to get the guns today or what made ya'll want to go back today? |
| D.J.: | I was going back. . . inaudible. . . and I said I wasn't touching none of them and that's when we went |

8

|  |  |
|---|---|
|  | back and I went with them, but I ain't never touched none of them guns. If he do got them, I ain't never touched of them. |
| Officer Moore: | Alright, there is a gun missing out the house and somebody had it. |
| D.J.: | N.L. had the bullets, so he probably got the gun. I told them I wasn't touch nothing. |
| Officer Moore: | But he didn't show you the gun? |
| D.J.: | . . . inaudible. . . he just showed me the bullets, so, I'm assuming he got the gun. I told him I wasn't touching nothing, as a matter of fact, when went on the track and that's when I was like. . .inaudible. . . |
| Officer Moore: | But ya'll were us [sic], the police riding around. |
| D.J.: | No, I had saw the police and that's when N.L. took out running, like I stayed, I was just walking and then I went by Jack house and that's when I went to D.A. house. |
| Officer Moore: | Ya'll didn't go in nobody else house, right? Yes, no? |
| D.J.: | No. |
| Officer Moore: | So, once again it was just you, M.L., lil N.L. and D. A. that went inside the house? |
| D.J.: | It was N.L. . . inaudible. . . |
| Officer Moore: | He stood outside by the fence. |
| D.J.: | . . .inaudible. . . |
| Officer Moore: | Watching |
| D.J.: | . . .inaudible. . . |

S.A., D.A.'s mother, testified that her son was released from school early on the 20th and he got home about 2:30. S.A. also testified about an incident that took place on September 26, and in the preceding days:

I was getting home from work and I was sitting in the work van and I seen some boys by the abandoned house next door to my house. And

9

they went and they went this gun; it was a black gun that they went get from in the back of the abandoned house. But, some days prior to that, a little boy named J.B. that lived by my house, had a gun and he was loading it in my yard, but, the gun went off in the back of my house and I noticed for a past few days that they little boy had been playing with this gun. And uh, I had reported it to the police officers. And, uh, the day that they had the gun when I was sitting in the van, um, the little boy J.B. went get the gun, M.L., he was with the little boy and somebody else that I didn't know. The gun went off, they threw the gun down and they ran through the bushes and they cut through the tracks. And that's where they ran with the gun and I never did see them no more that day, besides when the little boy came back to my house and he was playing with the gun, uh, J.B.

Officer Moore testified that during the course of his investigation, he talked to S.A., and she said that on the 25th, M.L., D.J., and "some other subjects" were shooting a handgun behind her house. She had identified two of the "present defendants" as the individuals involved. A.J., who was questioned by Officer Moore on the 26th regarding the shooting incident, testified she saw J.B. shooting a gun by himself; however, Officer Moore testified that A.J. told him that J.B., D.J., and M.L. were shooting the gun and he obtained written statements to that effect. J.B. testified about the incident on September 26, 2007, and denied any involvement.

D.A. specifically contends that the only evidence of his involvement came from D.J.'s statement, which was recanted. He notes that the testimony shows he remained outside and did not enter the residence, that D.J.'s testimony at the hearing did not implicate D.A., and that D.A.'s mother testified that she had seen J.B. playing with two other boys, and they were shooting a gun.

The judge found D.A. guilty of unauthorized entry of an inhabited dwelling based on his role as "lookout" for the others who entered the home. A review of the transcript of D.J.'s statement neither confirms nor refutes the fact that D.A. acted as a lookout. When D.J. was asked by Officer Moore if D.A. was "watching," he either did not answer the question (by speaking about something else) or his response is

inaudible. Thus, the only affirmative proof of D.A.'s involvement as a lookout, based on our review of the adjudication proceeding, is the testimony of Officer Moore that D.J. "stated clearly that D.A. stayed outside the residence by the fence, acting more as a lookout." As stated above, the transcript of D.J.'s statement neither confirms nor denies this assertion.

In *State v. Gordon*, 06-8, pp. 4-7 (La.App. 5 Cir. 3/30/06)on rehearing (5/15/06), 928 So.2d 689, 692-94, *writ denied*, 06-2319 (La. 4/20/07), 954 So.2d 159 (footnotes omitted), a similar issue was before the court on a claim of insufficient evidence:

> In his first assignment, Gordon complains the State failed to provide sufficient evidence to support his conviction for distribution of cocaine, arguing it did not prove that a drug transaction took place. Specifically, Gordon contends that the videotape introduced by the State does not corroborate Agent Wilson's eyewitness testimony. He argues that the videotape of the transaction is circumstantial evidence in that it does not show a hand-to-hand exchange between himself and the undercover officer, and that the tape leaves room for a reasonable hypothesis of innocence.
>
> . . . .
>
> Gordon contends, as he did below, that the videotape does not corroborate Wilson's testimony that defendant handed her a rock of crack in exchange for twenty dollars. Gordon argues that, because the tape does not show his or the officer's hands, it allowed for a reasonable hypothesis of innocence—for instance, that he was simply flirting with Wilson.
>
> Defendant's claim lacks merit. As the State points out, Wilson's testimony was, by itself, sufficient to prove the essential elements of the offense. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient to support a conviction.
>
> Wilson testified that she asked Gordon if he had a "twenty." Gordon told her to meet him in a specific place. Wilson testified that when she met defendant there, he gave her a rock of crack, and she gave him twenty dollars in payment. She stated that Gordon gave her a business card with a telephone number on it, and told her to call him if she needed anything else. While it is true that defendant's and Wilson's hands are not visible during most of the encounter depicted on the

11

videotape, the tape does not contradict Wilson's testimony. It depicts Gordon approaching Wilson's car and leaning into the driver's side window for a few moments. When he steps back, he appears to have something in his hand. Although Gordon appears to speak to Wilson during the encounter, there is no audio recorded on the tape.

A reviewing court does not assess the credibility of witnesses or reweigh the evidence. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness. The trier of fact is presumed to have acted rationally. In the instant case, the jury apparently found Wilson's testimony credible. There is nothing in the record to negate the presumption that the trier of fact has acted rationally.

In *State v. St. Amant*, 504 So.2d 1094 (La.App. 5 Cir. 1987), the appellate court held the result of the defendant's Intoxilyzer test was inadmissible at trial; thus, in addressing the sufficiency of the evidence presented at trial, the court had to consider whether the remaining evidence, the videotaped field sobriety test and the arresting officer's testimony regarding his sensory impressions, was adequate for the State to have met its burden of proof. The court concluded:

The only remaining evidence is the arresting officer's statement that when he first detained her she smelled of alcohol, was unsteady on her feet and seemed confused. He also testified, however, that she was unsteady on her feet during the videotaped field sobriety test, but that was not perceptible to us. Accordingly, we conclude his testimony alone is insufficient to carry the State's burden of proof.

*Id.* at 1098.

In *State v. Loisel*, 01-2018 (La.App. 4 Cir. 3/6/02), 812 So.2d 822, *writ denied*, 02-928 (La. 5/31/02), 817 So.2d 98, the defendant's demeanor on the videotape of the scene of his arrest for D.W.I. and at the sheriff's office during booking conflicted on some points with the information contained in the police report indicating the defendant was intoxicated. The court held that "the officer's statements in the police report (in comparison to the videotape) are legally insufficient to carry the State's burden of proof for the conviction." *Id.* at 829.

12

We find that Officer Moore's testimony that D.J. told him that D.A. acted as a lookout may be considered in support of the juvenile's adjudication of delinquency.

Since the evidence does not indicate D.A. entered the Idens' home, it is necessary to determine whether D.A. acted as a principal under La.R.S. 14:24, by aiding and abetting in the commission of the offense. Under a similar factual scenario, the second circuit in *State in the Interest of P.S.*, 459 So.2d 165 (La.App. 2 Cir. 1984), found sufficient evidence was presented to affirm a juvenile's conviction for simple burglary of an inhabited dwelling. In *P.S.*, during a detective's interview of Washington, a juvenile who burglarized the Range residence, Washington implicated P.S. P.S., in the presence of his mother, eventually admitted to the detective that he went with Washington to burglarize the residence, but acted as a lookout and did not enter the home. At the adjudication proceeding, P.S.'s mother gave a different version of what her son had confessed to during the interview with the detective. She testified that although her son had started out with Washington and knew he was going to burglarize the home, he did not participate in the crime, and later caught up with Washington after the completion of the burglary. She did not recall P.S. telling the detective that he acted as a lookout.

On appeal, the second circuit found the only evidence implicating P.S. in the crime was the testimony of the detective, which was contradicted by P.S.'s mother. The trial court had accepted the detective's testimony considering P.S.'s mother testified that she was unable to remember the entire statement given by her son to the detective. The appellate court, deferring to the credibility determination made by the trial court, found a rational trier of fact could have found P.S. guilty of the crime beyond a reasonable doubt, noting that even P.S.'s mother's recollection of the statement placed her son with Washington immediately before and after the burglary.

13

In the present case, the fact that an unauthorized entry of the Idens' home occurred was clearly proven, and the trial judge found D.A. acted as a lookout during the commission of this offense. We find that a rational fact finder could have found D.A. guilty as a principal to unauthorized entry of an inhabited dwelling beyond a reasonable doubt. Thus, this assignment of error has no merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In this assignment of error, the Juvenile asserts conflict attorneys should have been appointed for the four defendants. He contends that the attorney representing the four boys must have been aware that D.J. had given a statement to the police implicating the other boys as participants in the burglary. According to D.A., the city court's duty to investigate the necessity of appointing separate counsel was triggered by Officer's Moore's statement in his affidavit that D.J. had implicated the other juveniles. The Juvenile contends that it was not until December 13 that anyone recognized the existence of a conflict. The city court's response, to continue the adjudication of the remaining three juveniles, D.A. claims, was insufficient to hedge against any potential conflicts of interest.

Aside from the failure of the city court to conduct a preadjudication hearing on the propriety of appointing separate counsel, D.A. contends reversal is required because an actual conflict of interest existed. In support of this assertion, D.A. states:

> A clearer case of divided loyalties can hardly be imagined as D.J., not even represented by counsel or told about his rights on the 20[th], was forced to testify against D.A., M.L. and N.L. Then at the disposition both D.A. and D.J. were represented by the same attorney and that attorney made little attempt to have their sentences modified.
>
> Accordingly, having plainly established that an actual conflict existed, D.A. has demonstrated an independent ground for reversing his adjudication based on a violation of his right to effective assistance of counsel.

14

The facts apparent from the record in this case concerning the representation of D.A. prior to the disposition hearing are as follows. Court minutes of December 13, 2007, indicate that Kay Pittman represented D.A. at the initial adjudication hearing, which was continued due to a conflict.[2] On December 20, 2007, D.A., M.L., and N.L., were jointly tried and were represented by John West. Shentell Brown was present at the adjudication proceeding, but she did not question witnesses nor make any comments on the record during the proceeding.

This court's interpretation of counsel's argument is that the alleged conflict resulted from the joint representation of all four juveniles at the outset of the proceedings and not from the joint representation of D.A., M.L., and N.L. by John West at the adjudication proceeding. It appears a conflict of counsel issue was brought to the court's attention prior to D.A.'s adjudication proceeding. Court minutes of December 13, 2007, state in pertinent part:

> (2) THE STATE AND DEFENSE ADVISED THE COURT OF A CONFLICT WITH THE PUBLIC DEFENDER ATTORNEYS.
> (3) DUE TO THE ATTORNEY CONFLICT, THE COURT IS UNABLE TO TRIAL [sic] THIS MATTER.

In *State v. Cisco*, 01-2732, pp. 17-19 (La. 12/3/03), 861 So.2d 118,130-131, *cert. denied*, 541 U.S. 1005, 124 S.Ct. 2023 (2004)(alteration in original), the supreme court set forth the defendant's burden of proof for a conflict of interest claim raised pretrial:

> In a pretrial context, regardless of how the conflict of interest issue arises, the trial court has two options to avoid a conflict of interest: appoint separate counsel or take adequate steps to ascertain whether the

---

[2]Appellate counsel states in her brief, "Then at the December 13 hearing the adjudications of D.A., M.L., and N.L. were continued until December 20. The adjudication of D.J. was held with Kay Pittman representing D.J. and the other boys before their adjudication was continued. On the 20, John West represented the remaining defendants." We note the record *in this case* establishes only that Kay Pittman represented D.A. on December 13th and that John West represented D.A., M.L. and N.L. on the 20th.

15

risk of a conflict of interest is too remote to warrant separate counsel. *Tart*, 94-0025 at 19-20, 672 So.2d at 125 (relying on *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)); *State v. Edwards*, 430 So.2d 60, 62 (La.1983); *State v. Marshall*, 414 So.2d 684, 687-88 (La.1982). Failure to do one or the other in a case in which an actual conflict exists requires reversal. *Holloway*, 435 U.S. at 480, 98 S.Ct. at 1181; *State v. Carmouche*, 508 So.2d 792, 805 (La.1987) (on reh'g). As we stated in *Franklin*, 400 So.2d at 620, "If an actual conflict exists, there is no need for a defendant to prove that he was also prejudiced thereby."[18] Accordingly, in this case we are called upon to determine whether an actual conflict of interest existed and, if so, whether the defendant knowingly and intelligently waived his right to conflict-free counsel and whether the trial court took adequate steps to assure that defendant was afforded the very important requisite that the defendant's representation be conflict free.

CONFLICT OF INTEREST

This court in *State v. Kahey*, 436 So.2d 475, 485 (La.1983), defined an actual conflict of interest as follows, accepting the definition set forth in *Zuck v. Alabama*, 588 F.2d 436, (5th Cir.1979), *cert denied*, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979):

> If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to the other client.

This court has consistently held that a defense attorney required to cross-examine a current or former client on behalf of a current defendant suffers from an actual conflict. *See, e.g.*, *State v. Carmouche*, 508 So.2d at 804; *Franklin*, 400 So.2d at 620 ("[W]e must agree with the defendant's attorney, and with the trial judge, that an actual conflict arose when the state called [counsel's former client] to the stand. [Counsel] was put in the unenviable position of trying zealously to represent the defendant at trial while simultaneously trying to protect the confidences of a former client who was testifying for the state against the defendant."); *see also* Dane S. Ciolino, ed., *Louisiana Rules of Professional Conduct,* Rule 1.7 comment 3 (L.S.B.A.2001) ("As a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client without that client's consent.").

In *Carmouche*, a capital case in which this court reversed the conviction and sentence of death, we applied *Kahey* and *Zuck v. Alabama* and concluded that the defendant's counsel was confronted with an actual conflict of interest when another of his clients was arguably the most damaging prosecution witness against the defendant. There, the

defendant's counsel was served on the last day of trial with notice that the State intended to introduce inculpatory statements the defendant had allegedly made to a jail cellmate, who had agreed to testify only the day before. In objecting to the timing of the notice, counsel also noted the possibility of a conflict of interest because he was also representing the prosecution witness in an unrelated criminal matter. Counsel did not, however, not seek to be relieved of representation, request a recess for developing impeachment evidence, or move for a mistrial, and the witness proceeded to take the stand to give damning evidence against the defendant. Nonetheless, in determining whether counsel was faced with a conflict of interest, we held that counsel's statement was sufficient to alert the trial court that an actual conflict existed and that counsel could have felt required to balance the competing interests of his two clients. *Carmouche*, 508 So.2d at 804. We then noted that, once a conflict of interest is deemed to exist, it is presumed that the conflict will affect defense counsel's performance. *Id*. at 805. We eventually went on to conclude in *Carmouche* that the trial court failed to take adequate steps to protect the defendant's Sixth Amendment right to conflict-free counsel, necessitating the reversal of his conviction and sentence. *Id*.

[18] On the other hand, if the objection is made to the claimed conflict *after* trial, the defendant must show he was actually prejudiced. *Tart*, 94-0025 at 19-20, 672 So.2d at 125 (relying on *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).

Additionally, in *State v. Tart*, 93-772 (La. 2/9/96), 672 So.2d 116, *cert. denied*, 519 U.S. 934, 117 S.Ct. 310 (1996), the supreme court was called upon to determine whether an actual conflict of interest existed in the defendant's case. On appeal, the defendant claimed that his appointed counsel, Charles, had an actual conflict of interest resulting from his prior representation of a prosecution witness that denied the defendant of the right to effective assistance of counsel. The defendant argued that the trial court erred in failing to further inquire as to the conflict when the defendant sought to have Charles replaced immediately prior to trial. The supreme court noted that because a pretrial objection had been raised to counsel's continued representation of Tart, the trial court had two options to avoid a possible conflict: appoint separate counsel or hold a hearing to determine the risk of conflict. The supreme court found the trial court properly denied the request for replacement of counsel because separate counsel had already been appointed. This counsel, Tew, who served as co-counsel at Tart's trial, had no conflict with the witness, and it was Tew, not Charles, who cross-

17

examined the prosecution witness at the suppression hearing and at trial. Thus, the supreme court concluded that any possible conflict of interest never became an actual conflict, and the assigned error had no merit.

Addressing the issue of the court's duty to investigate conflicts of interest stemming from joint representation of co-defendants, the fifth circuit has held:

> LSA-C.Cr.P. art. 517(A) provides:
>
> > Whenever two or more defendants have been jointly charged in a single indictment or have moved to consolidate their indictments for a joint trial, and are represented by the same retained or appointed counsel or by retained or appointed counsel who are associated in the practice of law, the court **shall inquire with respect to such joint representation and shall advise each defendant on the record of his right to separate representation**.
>
> (Emphasis added.)
>
> In the present case, the trial court did not advise defendant of his right to separate representation as required by LSA-C.Cr.P. art. 517 prior to accepting his guilty plea. Thus, the issue is whether the trial court's failure to comply with Article 517 renders defendant's guilty plea invalid.
>
> Joint representation of co-defendants by the same counsel "is not *per se* violative of the constitutional guarantees of effective assistance of counsel" unless it gives rise to a conflict of interest. *State v. Smith*, 98-2078 (La.10/29/99), 748 So.2d 1139, 1142, *quoting Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978); *State v. Kahey*, 436 So.2d 475, 484 (La.1983). Prior to the enactment of Article 517 in 1997, the burden was on a defendant to notify the court that a possible conflict existed unless the circumstances were such that the court knew or should have known that a particular conflict existed. Absent those special circumstances, a defendant who raised no objection prior to or during trial had the burden of showing post-verdict that an actual conflict existed which adversely affected counsel's performance in order to establish a violation of the Sixth Amendment right to effective counsel. *State v. Smith, supra* at 1142, *citing Cuyler v. Sullivan*, 446 U.S. 335, 347, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980). Only if the trial court knew or reasonably should have known that a conflict existed did it have to initiate an inquiry into the joint representation.
>
> With the enactment of Article 517, an affirmative duty was placed on the trial court in cases of joint representation "to advise the defendant

of his right to conflict-free representation." Comment (b) to Article 517. Neither the article nor the comments set forth or discuss the repercussions for a trial court's failure to advise a defendant of his right to separate counsel.

In *State v. Miller*, 00-0218 (La.App. 4 Cir. 7/25/01), 792 So.2d 104, 113-115, *writ denied*, 01-2420 (La.6/21/02), 818 So.2d 791, the Fourth Circuit was faced with the issue of a defendant who proceeded to trial with joint representation without being advised of his right to separate representation pursuant to LSA-C.Cr.P. art. 517. The Fourth Circuit concluded that the failure of the trial court to inquire into the joint representation on the record did not rise to the level of a denial of a defendant's constitutional right and was subject to a harmless error analysis.

In reaching its conclusion, the Fourth Circuit relied on federal jurisprudence interpreting F.R.Cr.P. 44(c), upon which Article 517 is based. Citing *United States v. Holley*, 826 F.2d 331 (5th Cir.1987), *cert. denied*, 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 422 and *United States v. Benavidez*, 664 F.2d 1255, 1258 (5th Cir.1982), *cert. denied*, 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1352, the court in *Miller* found that Rule 44(c) was "strictly [a] procedural vehicle to lessen the possibility that after conviction a jointly represented defendant will assert a claim that his counsel was not conflict-free and thus was ineffective" *State v. Miller*, 792 So.2d at 114. The court concluded that Rule 44(c) did not give a defendant any new constitutional rights and, thus, by analogy, neither did Article 517.

The court in *Miller* ultimately concluded the record showed no actual conflict by counsel and noted the defendant failed to suggest any alternative defense he might have employed with separate counsel.

Recently, in *United States v. Salado*, 339 F.3d 285 (5th Cir.2003), the United States Fifth Circuit addressed the issue of whether a district court's failure to comply with Rule 44(c) warranted reversal of defendant's conviction. The federal appellate court stated that the trial court's failure to comply with Rule 44(c) did not, by itself, entitle a defendant to relief. The court explained that a defendant must still demonstrate an actual conflict of interest before his conviction would be reversed. The court further stated that where a defendant did not object to the possible conflict of interest before or during trial, he must also prove the actual conflict adversely affected his counsel's performance.

Based on the above, we find that a defendant who challenges his conviction on the basis he was deprived of his constitutional right to conflict-free representation because the trial court failed to comply with Article 517 bears the same burden of proof post-verdict that he bore prior to the enactment of Article 517; specifically, he must show an actual conflict existed which adversely affected his counsel's performance. Thus, the trial court's failure to inquire into the joint representation and

> to advise defendant of his right to separate representation as required by Article 517 does not warrant an automatic reversal.

*State v. Roberts*, 03-933, pp. 4-7, (La.App. 5 Cir. 12/30/03), 864 So.2d 860, 863-64 (footnote omitted)(alteration in original).

Again, it appears the joint representation of all four juveniles from the outset of the proceedings is the focus of counsel's argument. She additionally appears to contend that the city court should have investigated the conflict of interest issue prior to December 13, 2007. Clearly, she contends that the city court's response, when the matter was called to its attention, was insufficient.

First, the record before the court *in this case* does not establish that the four juveniles were all represented by the same attorney prior to the disposition hearing, and it does not appear that counsel is contesting the joint representation by Mr. West of the three juveniles on December 20, 2007. Even assuming all four juveniles were represented by one attorney up to the proceedings on December 13, 2007, nothing in the record *in this case* establishes that the city court judge knew that the juveniles were to be jointly tried prior to that time. The petition lists only D.A.; thus, the juveniles were not jointly charged in a single indictment, and the only court minutes preceding the December 13, 2007 minute entry mention only D.A. To say the judge was under a duty to investigate the conflict issue prior to December 13, 2007, is speculative given the record before the court *in this case*. Nevertheless, when the issue was brought to the court's attention on December 13, 2007, D.A.'s adjudication was continued, and the record establishes that D.A. was represented by different counsel on December 20, 2007. Whether this resulted from the city court's appointment of a different attorney is not entirely clear, but as in *Tart*, D.A. has failed to prove an actual conflict arose.

20

Next, the court will address counsel's argument as it relates to the disposition hearing. As stated above, D.A.'s argument regarding the disposition hearing is that D.J. and D.A. were represented by the same attorney and that attorney made little attempt to have their sentences modified.

The disposition hearing for all four juveniles was held January 24, 2008. At the outset of the disposition hearing, the judge stated that Ms. Brown was the primary attorney representing the defendants, but in the event there became an apparent conflict, Mr. West was present. When Mr. McGregor with the Office of Youth Development was asked by the judge if he had any recommendations regarding the dispositions, he stated that M.L. had informed him that it was he (M.L.), J.B., and D.B. involved in the incident, and that neither D.A., D.J. nor N.L. were involved. Over the State's objection, the judge allowed evidence to be presented on this issue by Ms. Brown. Immediately thereafter, Mr. West called M.L. to the stand. This prompted the following inquiry by the court:

Judge Simmons: Ok, who is representing Mr. M.L.? Ms. Brown is?

Ms. Brown: I represent D.J.

Mr. West: I represent M.L.

Mr. West and Ms. Brown both conducted the questioning of M.L., J.B., and D.B. In light of the new testimony presented, Ms. Brown argued for a new trial on behalf of D.J., and it appears from a comment made by the judge that Mr. West joined in the motion.

Court minutes of the disposition hearing show D.A. was represented by John West. Defense counsel states in her brief to this court that D.A. and D.J. were represented by Ms. Brown, Mr. West represented M.L., and it is not clear who represented N.L. The State contends in its brief that Ms. Brown represented D.J. and

21

Mr. West was present to represent D.A., N.L., and M.L. should a conflict arise. Counsel's assertion that D.A. and D.J. were represented by the same attorney at the disposition hearing is not established by the record as it is not clear who represented D.A. at the disposition hearing. Thus, it is impossible to determine whether an actual conflict of interest existed. This court will remand the case for an evidentiary hearing for the city court to determine whether an actual conflict of interest existed at the disposition hearing.

Courts have relegated conflict of counsel issues to post-conviction relief when the record is insufficient to address the issue. *See State v. M.M.*, 00-1296 (La.App. 3 Cir. 8/29/01), 802 So.2d 43, *writ denied*, 01-3370 (La. 10/4/02), 826 So.2d 1121; *State v. Griffin*, 02-1341 (La.App. 3 Cir. 3/5/03), 839 So.2d 1148; *State v. Anderson*, 29,282 (La.App. 2 Cir. 6/18/97), 697 So.2d 651. (*Griffin* and *Anderson* concerned ineffective assistance of counsel claims based on conflict issues). However, in other cases, courts have felt that the interest of justice and judicial economy would be better served by remanding the case for an evidentiary hearing so that the issue could be resolved promptly. *See State v. Lee*, 00-183 (La.App. 1 Cir. 2/16/01), 788 So.2d 452, *writ denied,* 00-1611 (La. 3/30/01), 788 So.2d 442, and *State v. Lemon*, 29,587, 29,588 (La.App. 2 Cir. 8/20/97), 698 So.2d 1057. Since this is a juvenile case, and in the interest of justice, this court will remand the case for an evidentiary hearing as opposed to relegating the issue to post-conviction relief proceedings.

As discussed previously, defense counsel on appeal contends that D.A. and D.J. were represented by the same attorney at the disposition hearing and that attorney made little attempt to have their sentences modified. Thus, upon remand of the case for an evidentiary hearing, the city court is instructed to determine whether D.A. and

22

D.J. were represented by the same attorney at the disposition hearing and whether that attorney was laboring under an actual conflict of interest.

## ASSIGNMENT OF ERROR NUMBER THREE

D.A. contends that an error patent resulted when the petition was not instituted by an authorized person, in violation of La.Ch.Code art. 842, and when the time constraint to answer the petition was not followed. In arguing this assignment of error, counsel concedes that these errors are waived because no objection was made; however, she states, "they are certainly illustrative of the kind of representation these children received when their attorneys literally played "musical chairs" and never followed up with representation from one hearing to the next. If there had been any continuity and separate attorneys for the children, perhaps these mistakes would not have been made." This is simply further illustration on the conflict of interest issue and does not warrant consideration as a challenge to the petition or the failure to adhere to the time limitation for answering the petition.

## CONCLUSION

D.A.'s adjudication is affirmed. For the above reasons, we remand this case with instructions that the city court conduct an evidentiary hearing within twenty days of this date to determine whether D.A. and D.J. were represented by the same attorney at the disposition hearing, and, if so, whether that attorney labored under an actual conflict of interest. The trial court is further ordered to prepare and lodge with this court an appellate record containing the transcript of the above-referenced evidentiary hearing within ten days of the hearing. Once this record is lodged with this court, the State and the Juvenile will be given the opportunity to file briefs should either party wish to raise any issues arising from the hearing.

**ADJUDICATION AFFIRMED; REMANDED WITH INSTRUCTIONS**.