# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 15-613 consolidated with 15-614 & 15-615

**STATE OF LOUISIANA**

**VERSUS**

**DEBBIE E. ADAMS AKA DEBBIE ADAMS**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CATAHOULA, NOS. 12-2404, 12-2405 & 12-2406
HONORABLE LEO BOOTHE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS**
**JUDGE**
\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Billy Howard Ezell, Judges.

**AFFIRMED.**

**Thibodeaux, Chief Judge, dissents in part and assigns written reasons.**

Annette Fuller Roach
Louisiana Appellate Project
P. O. Box 1747
Lake Charles, LA 70602-1747
Telephone: (337) 436-2900
COUNSEL FOR:
    Defendant/Appellant - Debbie E. Adams aka Debbie Adams

Bradley R. Burget
District Attorney – 7th Judicial District
4001 Carter Street - Suite 9
Vidalia, LA 71373
Telephone: (318) 336-5526
COUNSEL FOR:
    Plaintiff/Appellee - State of Louisiana

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

In the early morning hours of August 20, 2012, Annie Bell Adams, Edris "Eileen" Ellard, and John "Bozo" Ellard, Jr. were murdered. Shortly before 3:00 a.m., the Catahoula Parish Sheriff's Office received a call from Defendant, Debbie Adams, regarding a fight between Bozo and her boyfriend, Lee John Ponthieux, and shots fired from Annie Bell's property. Responding officers reported to that address and found Annie Bell stabbed to death in her bed, and the bodies of Eileen and Bozo in the front yard near a shed. Ponthieux was not found at the scene. Eileen suffered fatal stab wounds to her head and neck, and Bozo had been shot in the back of his head. Defendant, Annie Bell, Eileen, Bozo, and Ponthieux all lived on the property. Annie Bell was the mother of Defendant and Eileen. Bozo was married to Eileen, and had previously been married to Defendant. As set forth earlier, Ponthieux was Defendant's boyfriend.

Detectives questioned Defendant regarding the events of the evening, and identified Ponthieux as the principal suspect. Defendant first stated that after a day of drinking alcohol and taking various pills, Bozo and Ponthieux began fighting. Afraid that it would escalate, Defendant ran to a nearby neighbor, Scott Fields, to call the police. Defendant recalled hearing two gunshots on her way there. When questioned again two days later, however, Defendant admitted she saw Ponthieux stab Annie Bell before she fled from the house. Defendant consistently maintained, while she stated on several occasions she wanted them all dead, she never encouraged Ponthieux to kill them, and did not witness the murders of Eileen or Bozo.

Following an extensive search, Ponthieux was found just after midnight the next day. With him were the shotgun used to kill Bozo and the pocketknife used to fatally stab Eileen. Ponthieux gave three statements to the police regarding the

killings. In his first two statements, Ponthieux maintained he killed all three victims because Defendant frequently wished they were dead. In his first statement, however, Ponthieux stated he did not believe Defendant saw him stab Annie Bell, while in his second statement, he maintained that Defendant witnessed the stabbing. In Ponthieux's third statement, which was made two years later and after the start of Defendant's trial, he accused Defendant of killing Annie Bell and Eileen, and admitted only to accidentally shooting and killing Bozo after Defendant asked him to aim the gun at Bozo to scare him. Ponthieux attempted to explain his previous contradictory statements by stating he loved Defendant and wanted to keep her out of trouble.

Defendant was first arrested for obstruction of justice, and released five months later when the grand jury voted to pretermit the case. Following Ponthieux's trial, the grand jury returned three indictments against Defendant for the murders.

Defendant was charged for the first degree murders of Annie Bell, Eileen Ellard, and Bozo Ellard in violation of La.R.S. 14:30. Defendant pled not guilty to each charge, and was found guilty on each count. The trial court denied Defendant's motion for new trial, and sentenced her to three consecutive life sentences without the benefit of probation, parole, or suspension of sentence. Defendant's Motion to Reconsider Sentence was denied and Defendant now appeals her convictions, arguing insufficiency of the evidence, ineffective assistance of counsel, error in the introduction of gruesome photographs, and failure to record and preserve sidebar discussions. For the following reasons, we affirm her convictions.

2

## I.      Sufficiency of the Evidence

Defendant argues the evidence introduced at trial was insufficient to prove beyond a reasonable doubt that she is guilty of the first degree murders of Annie Bell, Bozo, or Eileen, either directly or as a principal to the crimes.

> First degree murder is the killing of a human being:
>
> . . . .
>
> (3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.
>
> . . . .
>
> (5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve or sixty-five years of age or older.

La.R.S. 14:30.1.

"All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La.R.S. 14:24.

> The standard for appellate review of the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed. 560, 573 (1979); *State v. Ortiz*, 96-1609 (La.10/21/97), 701 So.2d 922, 930, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); *State v. Barnes*, 98-932 (La.App. 5th Cir. 2/10/99), 729 So.2d 44, 46, *writ denied*, 99-1099.
>
> Under *Jackson*, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. *Barnes*, 729 So.2d at 46. A reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. *Id*.

*State v. Harrell*, 01-84, p. 6 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1018.

Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *State v. Ryan*, 07-504, p. 2 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268, 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988).

*Murder of Annie Bell*

Ponthieux and Defendant each provided multiple versions of how Annie Bell's murder occurred. While there were contradictions that challenge credibility, we can look to the consistencies and similarities in the stories for clarity. In doing so, we find the evidence introduced at trial was sufficient to convict Defendant for the first degree murder of Annie Bell as a principal to the crime.

We first consider all of Ponthieux's statements. In the first statement Ponthieux gave to police, he maintained that Defendant consistently (at least one hundred times) wished Annie Bell, Bozo, and Eileen were dead. Ponthieux told police that on the evening of the killings, Defendant had not directly asked him to kill her mother, but that he loved her enough to commit the crime for her. He suggested Defendant incited him to murder Annie Bell. Ponthieux stated that he got a butcher knife from the kitchen, went into the bedroom to show Defendant the knife, and told her he was going to do what she wanted. Defendant then exited the bedroom, and Ponthieux told detectives he interpreted Defendant's lack of response as approval. He then walked into Annie Bell's bedroom and stabbed her in the throat. In Ponthieux's first account, Defendant said nothing to him after

4

Annie Bell was stabbed, and Ponthieux believed Defendant was in the living room when the stabbing occurred, suggesting she did not witness the murder.

Similarly, in his second statement, Ponthieux maintained he killed all three victims because Defendant frequently wished they were dead. In this account, however, Ponthieux told police that after he grabbed the butcher knife, Defendant followed him into Annie Bell's bedroom and subsequently witnessed the stabbing. Again, Defendant said nothing, and it was not until after she witnessed the first stab wound that she left the room.

Two years later, and during Defendant's trial, Ponthieux gave another statement to detectives. In this account he completely denied all involvement in Annie Bell's killing. He told detectives he was asleep when Defendant killed Annie Bell, and, therefore, did not witness the murder. At trial, Ponthieux testified he previously confessed to Annie Bell's murder because he loved Defendant and was unsure of what happened on the night of the murders. He further testified that while he loved Defendant, he no longer loved her at the time of her trial because he felt as though he had been used. In his opinion, Defendant allowed him to believe he had committed the murders.

Defendant's statements were also riddled with inconsistencies and contradictions. In Defendant's first statement she claimed to not know Annie Bell was dead, and instead spoke of a fight that occurred between Bozo and Ponthieux that night. Further, it was not until her second statement that Defendant admitted to telling Ponthieux that she wished Eileen, Bozo, and Annie Bell were dead. Defendant continued to maintain, however, that she had no prior knowledge of her mother's murder, and instead worried that her dog was in danger when she heard the gunshots.

Later in her second statement, and after denying involvement, Defendant confessed she saw Ponthieux stab Annie Bell before she fled to Scott Field's

5

house. Upon further questioning, Defendant explained that Ponthieux came into her room with a butcher knife and told her he was going to kill Annie Bell. Because she did not believe Ponthieux would do it, Defendant took no action to stop him. Again, Defendant stated she saw Ponthieux stand over Annie Bell with a knife and stab her. Similarly, in her final version of events, Defendant told detectives she asked Ponthieux not to harm Annie Bell when she saw him standing over her with the butcher knife. She believed he had put the knife away, but she later found him in Annie Bell's bedroom, cutting her throat. Once again, Defendant stated she ran from the scene to contact the police. In each version of events, Defendant insisted she was telling the truth.

While Defendant may not have stabbed her mother to death, when after viewing the evidencing the light most favorable to the prosecution, a rational trier of fact could have found the evidence sufficient to find Defendant guilty of the first degree murder of Annie Bell as a principal to the murder.

The statements not only support the conclusion that Defendant witnessed Annie Bell's murder, but also that she was involved in its execution as well. In *State v. Neal*, 00-674, p. 12 (La. 6/29/01), 796 So.2d 649, 659, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002), the supreme court provided:

> [T]he defendant's mere presence at the scene is not enough to "concern" him in the crime. *State v. Schwander*, 345 So.2d 1173, 1174-75 (La. 1977). Only those persons who knowingly participate in the planning or execution of a crime may be said to be "concerned" in its commission, thus making them liable as principals. *State v. Knowles*, 392 So.2d 651 (La. 1980).

Despite later admitting she witnessed Annie Bell's stabbing, Defendant initially made a valiant effort to conceal her knowledge of Annie Bell's murder. "Evidence of . . . concealment . . . is relevant. It indicates consciousness of guilt, and therefore, is one of the circumstances from which the jury may infer guilt." *State v. Davies*, 350 So.2d 586, 588 (La.1977).

6

Although there was another residence between Annie Bell's house and Scott Field's home, Defendant passed it. Thus, Defendant could have summoned help sooner for Annie Bell, but chose not to. Once at Scott Field's home, Defendant mentioned only that Bozo and Ponthieux were fighting, and expressed only concern for the safety of her dog, and not her mother. Further, Defendant failed to tell the dispatcher for the Catahoula Parish Sheriff's Office that she knew her mother was dead or severely injured. Instead, Defendant complained of a fight and admittedly lied when she said Annie Bell was asleep when she left the house. She gave no indication that she knew Annie Bell had been injured. In fact, it was not until midway through her second statement that Defendant admitted to seeing Annie Bell being stabbed.

We find Defendant not only demonstrated her lack of credibility, but also presented substantial evidence of concealment. Thus, while the evidence was conflicting as to the exact role Defendant played in the death of her mother, we do find there was sufficient evidence for a rational trier of fact to find Defendant guilty of first degree murder as a principal.

### Murder of John "Bozo" Ellard, Jr.

In every statement made and in his trial testimony, Ponthieux maintained he shot the gun that killed Bozo. Because no evidence presented suggests otherwise, Defendant could only be found guilty as a principal to Bozo's murder.

According to Ponthieux's first two statements, Defendant was not present at the time of Bozo's murder, and had previously only expressed her desire that he were dead. However, in his third statement Ponthieux placed Defendant at Bozo's murder, and insisted she placed the loaded shotgun in his hands and told him to point it at Bozo. The gun then accidentally fired while in Ponthieux's hands, subsequently shooting Bozo in the back of the head.

7

If the jury believed Ponthieux's third statement to be true and his subsequent trial testimony, Defendant could be held liable for the first degree murder of Bozo as a principal to the crime, as the shooting would have been a foreseeable consequence of Defendant's actions.

> [U]nder general principles of accessorial liability, "all parties [to a crime]are guilty for deviations from the common plan which are foreseeable consequences of carrying out the plan. . . Acting in concert, each man then [becomes] responsible not only for his own acts but for the acts of the other."

*State v. Wiley*, 03-884, p. 14 (La.App. 5 Cir. 4/27/04), 880 So.2d 854, 864, *writ denied*, 04-1298 (La. 10/29/04), 885 So.2d 585 (quoting *State v. Smith*, 98-2078, p. 7 (La. 10/29/99), 748 So.2d 1139, 1143).

Defendant asserts that no physical evidence or other testimony supports the version of events offered by Ponthieux in his third statement and at trial. We disagree. The State also presented the testimony of Tammy Lemon, who shared a prison cell with Defendant for three months. Lemon stated Defendant told her she wanted Ponthieux "to kill them all." Lemon also stated, although she told detectives she ran out of the house when she saw Ponthieux slashing her mother's throat, she told Lemon she lied and "she was in that house all the while." Defendant told Lemon she was present when Ponthieux shot Bozo Ellard, and described how the gun was hit and the bullet ricocheted into a wall. As the State notes, this evidence is important as it contradicts Defendant's call to the dispatcher and statements to the detective. Lemon's testimony indicated Defendant was present at the murders of Bozo Ellard and Eileen Ellard. Although Lemon asked the State for dimunition of her sentence, she testified even after she was told the State would not give her any relief regarding her sentence. Lemon's testimony corroborates much of Ponthieux's third statement.

The jury also heard the testimony of Chief Deputy Toney Edwards of the Catahoula Parish Sheriff's Office, who arrived at the scene shortly after the murders. Chief Deputy Edwards testified he did not believe the physical evidence matched Ponthieux's first two statements. In those first two statements Ponthieux said Bozo was looking at him when he shot him, but Bozo was shot in the back of the head. Ponthieux also maintained in his first two statements that he shot only twice, but the evidence at the scene showed three shots were fired. Bozo was shot in the yard, not on the steps of the shed as Ponthieux said in his first two statements. Chief Deputy Edwards concluded that Defendant participated in the murder of Bozo.

Defendant also argues the complete contradiction of the first two statements by Ponthieux makes his subsequent version of events incredulous and not worthy of belief. However, Ponthieux testified he lied originally because he loved Defendant and wanted to help her avoid going to prison. If Ponthieux was going to kill for Defendant (as it is agreed he did for her), it is certainly not a leap that he would lie for her and "take the heat off of her." This leap is certainly made much easier when combined with the testimony of Lemon and the testimony of Chief Deputy Edwards that the evidence at the scene did not support Ponthieux's first two statements.

The factfinder's role is to weigh the credibility of the evidence. *State v. Ryan*, 969 So.2d 1268. Thus, other than assuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id*. at 1270 (quoting *State v. Lambert*, 720 So.2d at 726-27). We find there was sufficient evidence for a rational trier of fact to find Defendant guilty of the first degree murder as a principal of John "Bozo" Ellard, Jr.

9

*Murder of Edris "Eileen" Ellard*

Similar to Bozo's murder, Defendant argues the repudiation of his first two statements by Ponthieux makes his subsequent version of events incredulous and not worthy of belief. As with the murder of Bozo, we find there was evidence which corroborated the third statement and trial testimony of Ponthieux to implicate Defendant in Eileen's murder, either directly or as a principal.

Again, before Ponthieux's third statement placing Defendant at the scene of Eileen's murder, he had maintained Defendant fled from the house after Annie Bell's murder. As set forth prior, Ponthieux explained he lied originally because he loved Defendant and wanted to help her avoid going to prison.

Ponthieux testified that Defendant was not happy with the fact that Eileen had married Bozo, who was previously married to Defendant, and that she hated Eileen for marrying Bozo. Defendant also stated in her statement to police that Eileen had an affair with Bozo while he was married to Defendant, and that Eileen "took him away from her." In her statement to police, Defendant admitted she told Ponthieux she wished Eileen were dead. The testimony of Tammy Lemon corroborated Ponthieux's third statement and trial testimony that Defendant was at the scene when Eileen was murdered. The record was clear that Defendant was the one person who had the motivation, hatred and the confessed intent to kill Eileen.

The jury also heard the testimony of Chief Deputy Edwards that the killing of Eileen was overkill and concluded that Defendant was the logical person with the compulsion to commit those heinous acts. Chief Deputy Edwards noted in his first two statements Ponthieux stated he stabbed Eileen only twice, but the evidence revealed she was stabbed over twenty times. Further, the jury heard during the testimony of the forensic experts, that the knife used to kill Eileen contained DNA mixture from at least three individuals on the handle of the knife, and Defendant's could not be ruled out as a donor of the contact DNA.

Thus, in light of the aforementioned evidence adduced at trial, when viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found Defendant guilty of the first degree murder of Eileen.

## II. Ineffective Assistance of Counsel

Defendant further argues she was prejudiced by her counsel's deficient performance at trial. While the issue of ineffective assistance of counsel is typically addressed in an application for post-conviction relief, where an ineffective assistance claim is raised on appeal, this court may address the merits of the claim if the record discloses sufficient evidence. *State in the Interest of A.B.*, 09-870 (La.App. 3 Cir. 12/9/09), 25 So.3d 1012. "The standard of review on a claim of ineffective assistance of counsel is a deficiency in counsel's performance giving rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Teeter*, 504 So.2d 1036, 1040 (La.App. 1 Cir. 1987). A defendant must show this deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). We find the record is sufficient to address Defendant's ineffective assistance of counsel claims.

Defendant maintains she was prejudiced by her counsel's failure to object to jury instructions that did not instruct the jury to treat the testimony of the alleged co-defendant with great caution, define the term "principal," and instruct the jury that mere presence at a crime scene is insufficient to convict.

> Where the state's case relies upon the uncorroborated testimony of an accomplice, the trial judge should instruct the jury to treat such testimony with caution; however, such a cautionary instruction is not necessary in all cases in which an accomplice testifies on behalf of the state. Where there is material corroboration of the accomplice's testimony, the cautionary accomplice instruction is not required. The matter is one within the sound discretion of the trial court. As noted in [*United States v. Lee*, 506 F.2d 111 (D.C.Cir.1974), *cert denied.* 421 U.S. 1002, 95 S.Ct. 2403], it is enough if there is evidence that confirms material points in an accomplice's tale, and confirms the defendant's identity and some relationship to the situation.

11

*State v. Schaffner*, 398 So.2d 1032, 1035 (La.1981) (citations omitted).

The jury instructions informed the jury it should "scrutinize carefully the testimony given and the circumstances under which the witness has testified." It further explained the jury could discredit a witness's testimony because of a contradictory or inconsistent prior statement or by his prior conviction of a crime. Justice Lemmon, in his concurring opinion in *Schaffner*, 398 So.2d at 1036, stated "when there is an adequate jury instruction regarding bias, I do not believe that the trial court needs to give a special instruction warning the jury about an accomplice's uncorroborated testimony." Accordingly, such an instruction "is not 'an absolute necessity in all cases in which an accomplice testifies on behalf of the state'[.]" *Id.*

We find the instruction to carefully scrutinize witness testimony and circumstances was sufficient and thus alleviated the need for an additional instruction to review Ponthieux's testimony with great caution. We find that members of the jury knew Ponthieux had already been convicted of the murders and also were aware his testimony regarding the murders had changed on several occasions. In light of this, any reasonable jury would have given Ponthieux's testimony great scrutiny, regardless of a specific jury instruction requiring them to do so.

We next consider counsel's failure to object to the trial court's failure to instruct the jury on "principals." Louisiana Code of Criminal Procedure Article 802(1) provides "[t]he [trial] court shall charge the jury. . . as to the law applicable to the case[.]" The "trial judge has the duty to instruct jurors as to 'every phase of the case supported by the evidence whether or not accepted by him as true,'" including any theory the jury could infer from the evidence. *State v. Neal*, at 659.

Here, the jury, finding Defendant guilty of three first degree murders, could have also determined she was "concerned in the commission" of any of the murders and, thus, guilty of first degree murder as a principal. La.R.S. 14:24. Therefore, the trial judge had a duty to instruct the jury on the law of principals. Failure to give an instruction defining the law of principals may be a reversible error. *State v. Robichaux*, 165 La. 497, 115 So. 728 (1928).

Although we find the trial court erred in failing to instruct the jury on principals, Defendant's counsel also did not object to the omission. This failure, however, could be interpreted as being "within the ambit of trial strategy," as Defendant could have benefitted from that failure. *State v. Bienemy*, 483 So.2d 1105, 1107 (La.App. 4 Cir. 1986). Further, in order for counsel to be found ineffective, the omission must have prejudiced Defendant. To find Defendant guilty of first degree murder, the jury must have found she committed the murders or was a principal to them. However, to find her guilty as a principal would require less conduct by Defendant, and thus would have been a simpler conclusion for a jury to reach. Accordingly, we find Defendant was not prejudiced by her counsel's failure to object, but rather, she benefitted from the omission.

Defendant additionally argues counsel was ineffective for failing to request a jury instruction that her mere presence at the crime scene was insufficient to convict her as a principal. Such an instruction, however, would have simultaneously introduced the theory of principal liability. As stated above, Defendant benefitted from the trial court's failure to instruct the jury on principals. Accordingly, we find counsel was not ineffective in failing to request a jury instruction that her mere presence at the crime scene was insufficient to convict her as a principal.

Finally, Defendant maintains her counsel was ineffective in failing to object when the State, in its closing argument, erroneously told the jury her contact DNA

13

was "all over" the pocketknife that killed Eileen, when in fact, the evidence showed the handle of the knife contained a DNA mixture of at least three people, and that DNA analysis could not show how the contact DNA got on the knife or how long it had been there.

In order to find ineffective assistance of counsel, statements made in closing arguments must be so prejudicial this court "must be thoroughly convinced that the jury was influenced by the remark and that it contributed to the verdict." *State v. Byrne*, 483 So.2d 564, 572, *cert. denied*, 479 U.S. 871, 107 S.Ct. 243 (1986), (citing *State v. Jarman*, 455 So.2d 1184 (La.1984); *State v. Knighton*, 436 So.2d 1141 (La.1983), *cert.denied*, 465 U.S. 1051, 104 S.Ct. 1330 (1984); *State v. Sharp*, 418 So.2d 1344 (La. 1982)). However, jury instructions may adequately counteract any misstatement. *State v. Morgan*, 09-1745 (La.App. 1 Cir. 4/1/10) (unpublished opinion).[1] The first circuit noted "while it would have been prudent for defendant's counsel to object to [a] statement for which there was no evidentiary support, considering the trial court's specific instruction regarding argument by counsel, it is clear that defendant suffered no prejudice from this comment." (Where in their closing argument the State referenced bullets that were unsupported by evidence). *Id.* at 4.

Here, the trial court's jury instructions specifically stated opening and closing arguments were not to be considered as evidence. In light of this instruction, we find any prejudice that may have resulted from the State's misstatement was adequately counteracted, and thus the comments were not so prejudicial as to influence the jury and contribute to the verdict.

---

[1]The Westlaw citation is 2010 WL 1253367.

14

### III. Admissibility of Evidence

Defendant next argues the prejudicial effect of numerous gruesome photographs outweighed their probative value, and thus they were erroneously admitted into evidence at trial. In *State v. Vercher*, 14-1211, p. 12 (La.App. 3 Cir. 5/6/15), 162 So.3d 740, 747, this court held the admission of photographs "will only be disturbed if the prejudicial effect of the photographs clearly outweighs their probative value." "The standard of review in this situation is abuse of discretion." *State v. Hampton*, 96-608, p. 6 (La.App. 3 Cir. 12/11/96), 687 So.2d 505, 509, *writ denied*, 97-16 (La. 5/9/97), 693 So.2d 766.

In *State v. Magee*, 11-574 (La. 9/28/12), 103 So.3d 285, *cert. denied.* __ U.S.__, 134 S.Ct. 56 (2013), the Supreme Court held gruesome photographs were not erroneously admitted into evidence. The court stated in pertinent part:

> Even when the cause of death is undisputed, the state is entitled to the moral force of its evidence and post-mortem photographs of murder victims are admissible to prove *corpus delicti*, to corroborate other evidence establishing cause of death, as well as the location and placement of wounds, and to provide positive identification of the victim. Photographic evidence will be admitted unless it is so gruesome that it overwhelms jurors' reasons and leads them to convict without sufficient other evidence.

*Id*. at 323 (citations omitted).

However, the supreme court has only once, in *State v. Morris*, 245 La. 175, 157 So.2d 728 (1963), found a lower court improperly introduced gruesome photographs. In *Morris*, the defendant admitted he killed the victim; however, the issue was whether the killing was intentional or committed in the heat of passion. The color photographs were determined to be "grotesque and revolting." *Id*. at 730.

Here, however, while there is no dispute that gruesome photographs were shown to the jury, the facts sought to be proven at trial included victims' injuries, the number and extent of the wounds, and location of the bodies. The autopsy

photographs helped explain to the jury how the wounds caused or contributed to each death, and on numerous occasions the trial court warned the jury of the graphic nature of the images. We find the photographs were not so unnecessarily gruesome as to influence the jury's verdict, and their prejudicial effect did not outweigh their probative value. Thus, the trial court did not improperly admit these photographs into evidence.

As a result of their admission into evidence, Defendant additionally argues her counsel was ineffective in failing to ensure that the objections to the admissibility of the photographs were properly recorded for appellate review, or alternatively, that counsel was ineffective in failing to object if the issue was not properly preserved.

According to the court reporter, defense counsel did not file a motion to exclude the photographs. He did, however, file a motion for new trial in which he argued, *inter alia*, that the introduction of various photographs were inflammatory and denied Defendant's right to an impartial jury. At the hearing on that motion, counsel for both Defendant and the State referenced defense counsel's objections to the photographs, although the trial record presents no evidence of an objection.

Before counsel can be found deficient, Defendant must first demonstrate counsel actually failed to properly preserve a valid issue. Further, even if we were to find counsel failed to preserve the issue for consideration on appeal, we find Defendant was not prejudiced by the omission because as stated above, the photographs were not improperly admitted into evidence.

## IV.  Sidebar Conversations

Lastly, Defendant states the trial court erred in failing to assure discussions and arguments made by counsel during sidebar discussions were recorded and preserved for appellate review, thus denying Defendant of her constitutional right to an appeal.

16

Louisiana Code of Criminal Procedure Article 843 requires the trial court to "record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel."

Material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal. *See State v. Robinson*, 387 So.2d 1143 (La.1980) (reversal required when record failed to contain the testimony of a State and defense expert witness); *State v. Ford*, 338 So.2d 107 (La.1976) (reversal required when record missing the testimony of four State witnesses and the voir dire of prospective jurors). On the other hand, inconsequential omissions or slight inaccuracies do not require reversal. *State v. Goodbier*, 367 So.2d 356, 357 (La.1979) (reversal not required when record does not include a transcript of the voir dire examination and affidavit of court reporter indicated that counsel made no objections during voir dire).

This court has never articulated a *per se* rule either requiring the recording of bench conferences or exempting them from the scope of La.Code Crim. Proc. Art 843. Still, art 843's description of "objections" and "arguments" will normally apply only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke art. 843. *State v. Clark*, 93-0903, pp. 2-3 (La.App. 3d Cir.1994), 638 So.2d 225, 227; *State v. Richardson*, 529 So.2d 1301, 1308 (La.App. 3d Cir.1988). Similarly, Art. I. §19's command to record "evidence" does not encompass bench conferences, at least, not ones that do not satisfy the materiality requirements of La.Code Crim. Proc. art. 843.

The defendant complains primarily about four unrecorded bench conferences which occurred during the guilt phase. Additionally, the trial court conducted the charge conferences off the record. The defendant also notes that the initial discussion of the jury's penalty phase questions directed toward the existence of a juvenile record for defendant occurred off the record.

. . . "[N]othing in the record suggests the unrecorded conferences had a discernible impact on the proceedings nor does the defendant point to any specific prejudice. *See State v. Castleberry*, 98-1388, pp. 28-29 (La.4/13/99), 758 So.2d 749 (absence from the record of four unrecorded bench conferences did not deny defendant effective appellate review; three of the conferences had no discernible impact on the proceedings and the fourth concerned a mistrial motion whose basis was readily discernible in the recorded testimony of the witness).

*State v. Hoffman*, 98-3118, pp. 49-51 (La.4/11/00), 768 So.2d 542, 586-87,

*cert. denied*, 531 U.S. 946, 121 S.Ct. 345 (2000) (footnotes omitted).

Here, four unrecorded bench conferences took place during jury selection. The first conference concerned a motion in limine that dealt with the admissibility of Defendant's recorded statements. Although the bench conference was unrecorded, the motion was argued and decided on the record, therefore showing no prejudice. The second bench conference concerned the timing of Ponthieux's cross-examination and potentially discussed an ideal time to recess. The third bench conference occurred at the close of Defendant's case, after which defense counsel informed the court he would not present any evidence, but would introduce two exhibits to the jury. The final bench conference took place just prior to the reading of the jury instructions.

Defendant has identified no issues which might have impacted the proceedings, and, thus, has shown no specific prejudice that resulted from the unrecorded conferences. Further, none of the bench conferences appear from the context of the record to address any issue resulting in prejudice to Defendant or the trial in any manner.

## DECREE

For the foregoing reasons, Defendant's convictions and sentences for the first degree murders of Annie Bell Adams, Edris "Eileen" Ellard and John "Bozo" Ellard, Jr., are affirmed.

**AFFIRMED.**

18

STATE OF LOUISIANA

VERSUS

DEBBIE E. ADAMS AKA DEBBIE ADAMS

**THIBODEAUX, Chief Judge, dissenting in part.**

I agree that Adams is guilty as a principal to the murder of Annie Bell. I disagree, however, that the evidence is sufficient to convict Adams beyond a reasonable doubt for the murder of Bozo and Eileen.

No physical evidence or testimony, other than Ponthieux's third statement and the testimony of Tammy Lemon, an inmate who shared a cell with Adams at the Louisiana Correctional Institute for Women, placed Adams at the scene of Bozo's murder. Further, while forensic testing of the gun could not exclude Adams, it revealed a mixture of DNA from at least three individuals. Additionally, because Ponthieux gave his third statement two years later and completely contradicted his first two statements, and because Lemon's statement was wholly unsupported by evidence, I do not find them to be factually or legally sufficient to support a finding of beyond a reasonable doubt. Thus, no reasonable factfinder could find Adams guilty of the first degree murder of Bozo.

Similar to Bozo's murder, there was little evidence presented at trial to implicate Adams in Eileen's murder, either directly or as a principal.

Again, it was not until Ponthieux's third statement, given two years after his initial statements, that he placed Adams at the scene of Eileen's murder. Before that time, Ponthieux consistently maintained Adams fled from the house after

Annie Bell's murder. Although Tammy Lemon's testimony suggested Adams may have witnessed Eileen's murder, not only were her statements largely unsupported, as previously stated, but they failed to prove her involvement.

Further, no physical evidence was presented to support Adams's presence at the scene. While forensic evidence could not conclusively rule out Adams as Eileen's killer, it revealed a contact DNA mixture from at least three individuals on the handle of the knife used to kill her. More significantly, no blood was found on Adams's clothing to suggest she killed Eileen, as described in Ponthieux's third statement. Had Adams killed Eileen in the manner described by Dr. Eserman, an expert in forensic pathology, contact with her blood would have been unavoidable.

Additionally, although Chief Edwards believed Adams moved Eileen's body due to the pool of blood found on the steps of the shed instead of where Eileen's body was found, this theory was unsupported by evidence. In fact, Dr. Eserman determined Eileen died within one minute of suffering her fatal wounds, indicating Eileen could have moved towards Bozo on her own.

Thus, in light of the aforementioned evidence, no reasonable factfinder could find Adams guilty of the first degree murder of Eileen.

For the foregoing reasons, I respectfully dissent in part.

2